SANCTA MARIA HOSPITAL vs. CITY OF CAMBRIDGE
& another.[1]

Middlesex. November 4, 1975. — January 26, 1976.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Municipal Corporations,* Disposal or use of property, Contracts, Offi-
cers and agents. *Contract,* With municipality, Validity. *Cam-
bridge.*

A city manager who was authorized by the city council to convey cer-
tain real estate for a minimum sum had the implicit authority to
enter into a contract more favorable to the city by conveying only
a portion of the entire tract for the minimum sum. [592-594]
When a buyer offered to purchase for $300,000 the buildings and
land of a sanitarium owned by the city of Cambridge, with the
understanding that a portion of the land would be retained by the
city, and the city manager, having obtained authorization from
the city council to sell the entire parcel for $300,000, accepted the
offer for less than the entire parcel, a binding agreement for the
purchase and sale of the smaller parcel was formed even though
both parties understood that further negotiations would be neces-
sary to "complete" the terms of the contract, including the precise
boundaries of the portion to be retained by the city [592-594]; full
payment of the $300,000, prior to agreement on all the terms of
the contract, did not result in a completed contract for the con-
veyance of the entire parcel [594-595]; the fact that both parties
may have been mistaken as to the authority of the city manager to
execute an affidavit which was recorded with the deed explaining
the conveyance of a parcel smaller than that authorized by the
council and providing that in the event of a certain contingency
the property would be reconveyed to the city and the city would
pay the fair value of any additional construction on the property
did not require reformation of the deed to provide for conveyance
of the entire tract. [595-596]

[1] John Corcoran, city manager of the city of Cambridge.

BILL IN EQUITY filed in the Superior Court on January 10, 1973.

The suit was heard by *Ponte, J.,* on a master's report.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Edward D. McCarthy,* City Solicitor (*Birge Albright* with him) for the city of Cambridge & another.

*John F. Cremens* (*Howard J. Alperin* with him) for the plaintiff.

HENNESSEY, J. This action for declaratory judgment pursuant to G. L. c. 231A seeks a determination of the plaintiff's rights in a parcel of land in Cambridge (lot B) located adjacent to the present site of the Sancta Maria Hospital (hospital). The action was referred to a master who, after hearing the parties and receiving their exhibits, filed his report with the Superior Court. Both parties objected to various findings of the master, whereupon a judge of the Superior Court ordered that the report be recommitted to the master for the purpose of his finding subsidiary facts. This accomplished, the defendant (city) moved to strike the master's report in its entirety; the motion was denied after a hearing in the Superior Court. The report was confirmed by interlocutory decree and a judgment was entered which instructed the city to transfer lot B to the hospital through the medium of the present city manager. We conclude that this was error.

We summarize the master's findings. On April 10, 1963, Richard Cardinal Cushing, Roman Catholic Archbishop of Boston, as the representative of the Daughters of Mary of the Immaculate Conception (a religious order which operated the hospital), offered to the city through John J. Curry, the then city manager, to purchase the buildings and land of the Cambridge Sanitarium for $300,000. In his written offer the Cardinal stated: "I understand . . . that some of the land is to be retained by the City of Cambridge for recreational purposes."

The city manager submitted a letter to the city council (council) informing the council of the offer, the price term, and the "understanding" of the Cardinal that part of the land was to be retained for recreational purposes. The council adopted an order which authorized the city manager, on behalf of the city, to convey a parcel of land estimated to contain 325,828 square feet (which parcel included what we refer to as lot B) for a sum not less than $300,000. On April 18, 1963, the city manager wrote to Cardinal Cushing, informed him of the substance of the letter transmitted to the council [2] and the council's order, and accepted the April 10 offer for the city. The hospital paid $300,000 to the city in instalments, the last increment being paid on August 31, 1963.

Between the last mentioned date and sometime in April, 1964, discussions were had by counsel for the hospital and representatives of the city with respect to the city's retaining 100,000 square feet of the total area authorized to be conveyed.[3] During this discussion period there was no objection by the hospital to the exclusion of lot B from the area of land to be conveyed.[4] The deed

---

[2] The documents before the master and before us on this appeal also contain a letter from the city manager to the Cardinal dated April 15, 1963 (the same date the council was informed of the offer), wherein the city manager acknowledged that the Cardinal was "acquainted with the fact that some of the land [would] be retained by the City of Cambridge for recreational purposes."

[3] We believe it can be inferred that these discussions were initiated well before the last instalment was paid on August 31, 1963. The inference arises from the fact that a plan was prepared, dated May 29, 1963, by the then acting city engineer, showing a subdivision of the sanitarium grounds into two parcels. Lot B on that subdivision contains 100,000 square feet, more or less, and is the same lot B we refer to throughout this opinion.

[4] Indeed, on April 22, 1964, counsel for the hospital wrote to the city solicitor that "[a]s regards the discrepancy between the Council Order and the deed which conveys approximately 100,000 square feet less than the order authorized, certainly no one could question the action of the City of Cambridge since it is obviously to their advan-

was executed on April 16, 1964. It transferred to the hospital only 225,828 square feet, more or less, for the stated consideration of $300,000, and contained (1) a reservation of a right of way for the benefit of lot B; (2) a sewer easement; and (3) this language: "This conveyance is made upon the condition that the granted premises are to be used by the grantee for religious, educational, or hospital purposes during the term of ten (10) years from the date of this deed. If the grantee ceases to use the granted premises for . . . [such] purposes during said term, the granted premises shall be sold and conveyed to the grantor upon the payment to the grantee of the consideration of the sum of Three Hundred Thousand (300,000) Dollars."

After the signing of the deed, further communication between representatives of the city and counsel for the hospital[5] resulted in the execution, by the city manager, of an affidavit which was recorded with the deed and

---

tage to receive the minimum price for less than the entire tract. *We do not question the deal since we were prepared to pay $300,000.00 for the lesser area"* (emphasis added).

[5] Correspondence between the city solicitor and an attorney for the hospital reveals this dialogue:

CITY SOLICITOR (April 17, 1964): "There are . . . other points as you will see from comparing the Council Order with the description in the deed. The rear land consisting of . . . 100,000 square feet was included in the Council Order before final agreement on the terms was reached. If you feel that some document should be on record to explain the difference, I shall be glad to have one executed. I think a certificate from the Manager should suffice.

"Next, since the condition for repurchase· of the property by some remote possibility might come into effect after expensive construction, the city is prepared to agree to pay on a cost basis for such construction. This possibility, of course, is very unlikely."

ATTORNEY FOR THE HOSPITAL (April 22, 1964): "As regards the discrepancy . . . I am concerned only with the possibility that some of the proposed additional construction by Sancta Maria Hospital may be financed by a real estate mortgage and I would not want counsel for a lending institution to question our title. I do not feel that a revised Council Order is necessary and I believe that a Certificate of

provided in substance that "as a result of an agreement
between the grantor and the grantee" entered into sub-
sequent to the council order of April 15, 1963, the city
was conveying to the hospital a lesser tract than the
council had authorized. The affidavit went on to state
"that the grantor agrees to pay to the grantee in addition
to the sum of Three Hundred Thousand ($300,000) dol-
lars, if the condition . . . in said deed should require a
reconveyance to the grantor, the fair value of any addi-
tional construction upon the site by the grantee." The
hospital proceeded to erect a number of buildings on the
property, the fair market value of which is now approxi-
mately $6,000,000. The city never has used lot B for any
recreational or other purpose, and never has dedicated it
to the purpose of recreation.

The master found that the hospital realized only re-
cently that it needed additional land for the erection of
more buildings in order to perform the condition included
in the deed, namely, "to maintain [itself] as a hospital
for the period of ten years." Since the master found that
the council gave the city manager authority to transfer
only the entire 325,828 square feet and not a part thereof,
and since he further found that both parties were mis-
taken as to the authority of the city manager to contract
with the hospital for a repurchase of the land conveyed
in consideration of the city's promises in the deed and in
the affidavit,[6] a judge of the Superior Court granted the
relief prayed for by the hospital.

the Manager explaining the circumstances and in a form which could
be affixed to the deed, should certainly take care of the question.

"As you say, the possibility of forfeiture by failure to use the
premises for religious, educational or hospital purposes is extremely
unlikely. I think a separate agreement, in the form of an exchange
of letters or otherwise, covering the consideration for such re-purchase
would suffice or in the alternative, there could be added in the deed
at this point, the words 'plus the fair value of any additional con-
struction upon the site by the grantees.' Since the deed is already
executed, I would not presume to add such words myself."

[6] It appears that the master treated the city manager's affidavit as
providing for a "transfer back" to the city of lot B in exchange for the

The many issues briefed and argued on this appeal narrow down to one of significance: Was there a contract between the city and the hospital for the conveyance of 325,828 square feet of land for $300,000? If we answer this question in the negative, we need not reach any other issue.

We conclude that there never was a contract for the transfer of an area of land including lot B. We thus necessarily hold that the city manager was authorized by the council to convey less than the entire parcel mentioned in the council order of April 15, 1963, and that the parties were not mistaken as to the terms of their contract. Therefore, reformation of the deed will not lie here.

We are guided by certain principles regarding our function in reviewing a judgment based on a master's report. When such a report is confirmed by interlocutory decree of the Superior Court, this merely establishes the facts as found by the master. On appeal from a judgment, this court will decide the case solely on the report of the master, *Fisher* v. *MacDonald*, 332 Mass. 727, 729 (1955), but will apply proper legal principles to the facts as found and will correct any errors detected, using the standard that a master's findings cannot stand if mutually inconsistent, contradictory or plainly wrong. See Mass. R. Civ. P. 53 (e) (2), as amended, 367 Mass. 917 (1975). Compare *Blanchette* v. *Blanchette*, 362 Mass. 518, 521

city's promise to pay the cost of additional construction on the land contemplated by the hospital. We can find no basis for this treatment of the affidavit in the record before us. The correspondence of the parties indicates that the affidavit was intended to remove any cloud on the hospital's title to the 225,828 square foot tract and to provide for payment of the purchase price plus the fair value of improvements made on the land if a reconveyance to the city were necessary in the event the deed's condition was broken by the hospital. The affidavit's wording is clear that "Lot B . . . *remains* as the property of the [city] . . . ." (emphasis supplied). While this error by the master generates some confusion with regard to his other findings, it does not alter the result we reach. See nn. 9 and 10, *infra*.

(1972), with *Foot* v. *Bauman*, 333 Mass. 214, 219 (1955). This is a proper statement of the scope of our review in these instances even where, as here, no appeal was taken from the interlocutory decree confirming the master's report. *Mackey* v. *Rootes Motors, Inc.*, 348 Mass. 464, 469 (1965).

1. The hospital urges, and the master found, that the council gave the city manager authority to transfer only the entire tract and the buildings thereon. Turning to the language of the acceptance of the offer, it is argued that the city manager bound the city to sell the land and buildings known as the Cambridge Sanitarium; that the city manager took $300,000 as full payment for all of the land of the sanitarium as described in detail in the council order; and that the full payment was paid before any agreement was reached with regard to retention of lot B by the city. Since the city manager had no authority to obligate the city to pay an unknown large sum of money in consideration for a retransfer of the land conveyed, it is said that the affidavit was executed without the knowledge or authorization of the council, and, consequently, the purported consideration for the retransfer fails.

The answer to these contentions lies, first of all, in considering the effect of the council order of April 15, 1963. It is true that the plan of government adopted by the city of Cambridge vests all the legislative powers of the city in the city council, G. L. c. 43, § 97, and that the sale and conveyance of city-owned property is essentially a legislative function. Compare G. L. c. 39, § 1, with G. L. c. 40, § 3. However, it is basic that the execution of council orders may be entrusted to and carried out in their particulars by, among other city officers, the city manager. See *Ballantine* v. *Falmouth*, 363 Mass. 760, 766 (1973); *Ring* v. *Woburn*, 311 Mass. 679, 687 (1942); *Fluet* v. *McCabe*, 299 Mass. 173, 178-180 (1938). The council may proscribe entirely, limit, or grant wide discretion to the city manager in carrying out its orders. See generally *Ballantine* v. *Falmouth, supra* at 764.

("In fact . . . the [town officers] were merely *authorized* to enter into a lease. It was not then certain that they would be able to do so on terms satisfactory to them" [emphasis in the original].) By analogy to the circumstances presented on this appeal, we note that G. L. c. 40, § 15, which deals with the conveyance of land acquired by a city other than by purchase,[7] provides for authority on the part of the city manager[8] to sell only a part of a tract authorized to be sold by city council order. We are not persuaded that the Legislature's purpose in distinguishing between the conveyance of lands acquired by eminent domain and lands acquired by devise or otherwise was to circumscribe a city manager's authority to negotiate the terms of a conveyance involving the latter lands.

This is not to say that a city manager may nullify any advantage afforded the city by an agreement authorized by the city council. *Elbe File & Binder Co.* v. *Fall River*, 329 Mass. 682, 685 (1953) (lease agreement). A city manager, like the city council, is impressed with the duty to act on contracts in a manner not prejudicial to the city's interests. *Rollins* v. *Salem*, 251 Mass. 468, 471 (1925). This duty, we think, allows for some judgment on the city manager's part in concluding contracts on terms even more favorable than the city council envisions when it acts.

The intent of the parties as gleaned from their objective manifestations indicates that neither the offeror nor

---

[7] It has not been brought to our attention how the city acquired the sanitarium grounds.

[8] The statute's wording places this authority in the mayor or the selectmen, but G. L. c. 43, § 104, which specifies the powers and duties of a city manager under a plan of government such as the one adopted by the city of Cambridge, provides that the city manager possesses the powers, rights and duties possessed by the mayor (and others) before the adoption of the plan. See *Curry* v. *Cambridge*, 351 Mass. 28, 30 (1966).

the offeree contemplated the purchase and sale of the entire 325,828 square feet. It was at all times understood that $300,000 was to be paid to the city for "the land and buildings" of the sanitarium, but it was equally clear that further negotiations between the parties would be necessary to fix the boundaries of the area which both parties knew the city planned to retain for public purposes. Additional subjects for negotiation, as it turned out, were the location of two easements and the provision regarding return of the parties to the status quo ante should the hospital cease to use the land for charitable endeavors.[9] The lack of a complete agreement as to all the terms at the time of the council order does not prevent our finding a binding agreement when the city manager accepted the Cardinal's offer. *Eno* v. *Prime Mfg. Co.*, 314 Mass. 686, 690-691 (1943). See 1 A. Corbin, Contracts § 95, at 400-402 (1963); 1 S. Williston, Contracts § 48, at 156-157 (3d ed. 1957).

A further consideration bearing on the intent of the parties — one which, however, we do not hold dispositive of this case — is the fact that the deed accepted by the hospital unmistakably describes the tract conveyed as containing only 225,828 square feet. When the hospital later expressed concern over the discrepancy between the area described in the deed and the area authorized to be sold by the council order, the tenor of their concern, see n.5 *supra,* was that certain lending institutions might question the hospital's title, presumably on grounds relating to a possible lack of authority in the city manager to digress from the authorization in the council order. The affidavit of the city manager was in part intended merely to explain the 100,000 square foot discrepancy. See n.6 *supra.*

We have no doubt that this analysis of the contract we are dealing with here is sound. There are, however, re-

_____

[9] We express no opinion on the authority of the city manager to include this condition in the deed. See note 10 *infra.*

lated assertions made by the hospital which merit some treatment. These are, first, that payment of the agreed purchase price in full prior to execution of the deed "completed" the contract. The short answer to this contention may be implied from our discussion, *supra*. Suffice it to say that we do not view the transaction in issue here as having been consummated as early as August 31, 1963.

Second, the hospital believes it an indication of the city's intent that no use for or dedication to public purposes has ever been made of lot B, thus calling for the inference that the city believed it had sold the 100,000 square feet. Conversely, we are not apprised of any move on the hospital's part to exercise control over or to use lot B for its own purposes. Without more we are not inclined to speculate as to the effect, if any, of the nonuse of the disputed parcel by both parties.

Finally, the hospital would have us hold that reformation of the deed is proper here because both parties were mistaken as to the authority of the city manager to bring about the legal effect of the affidavit he executed on April 23, 1964. Assuming that to be the case, we conclude that the full weight of any mistake as to authority here must be borne by the hospital for several reasons. It has been said, and we agree in this instance, that one dealing with the officers or agents of a municipal corporation must, at his peril, see to it that those officers or agents are acting within the scope of their authority. The reason for this rule is that the actual extent of the authority of such an officer or agent is a matter of record in the statutes of the Commonwealth or the proceedings of the city council. See *Higginson* v. *Fall River*, 226 Mass. 423, 425 (1917); 56 Am. Jur. 2d Municipal Corporations § 504 (1971).

In addition, this court will not decree a reformation unless we are convinced that the parties expressed agreement and an intention to be bound in accordance with the terms that we are asked to establish and enforce. See *Ritson* v. *Atlas Assurance Co.*, 279 Mass. 385, 391 (1932)

(contract of insurance). Where a petitioner's acquiescence in an agreement is induced by his own mistake alone, rescission and restitution may be proper remedies, but we will not grant reformation. See *id.* at 390-391. Even if we assume here that both parties were mistaken with respect to the city manager's authority to execute the affidavit, we will not enforce a contract the terms of which were never assented to by the city. 3 A. Corbin, Contracts § 614, at 723, 725-726 (1960).

A final reason for placing the onus of the alleged mistake on the hospital also makes good sense: To do so would not substantially frustrate the purpose of the hospital in entering into the transaction with the city in the first instance. See *Rackemann* v. *Riverbank Improvement Co.*, 167 Mass. 1, 4 (1896). The hospital was willing to pay the minimum purchase price for less than the entire sanitarium grounds. See n.4 *supra.* Additionally, the lack of authority on the part of the city manager to bind the city to pay the fair value of additional construction in the event of a reconveyance would operate only to invalidate that portion of the contract. See *Ballantine* v. *Falmouth,* 363 Mass. 760, 764-765 (1973). Under our construction of the agreement between the parties, the city would still have been able to enforce the sale of 225,828 square feet of the tract for $300,000.[10]

From our discussion it should be clear that we are holding both that some of the master's findings relating to the contract entered into by the parties (as outlined above) were plainly wrong, and that the legal conclusions

[10] In any event, it is a moot question at this time whether the condition in the deed providing for a reconveyance to the city was valid, just as it is moot whether the provision in the affidavit relating to payment of the fair market value for additional construction was valid. Ten years have passed and the hospital has not ceased to use the premises for the purposes stated in the condition, nor have we been informed that the city, if a reconveyance had been called for, would not have complied with the terms in the affidavit of its manager.

reached by the Superior Court judge were incorrect. The city manager could convey less than the entire tract; the payment of the $300,000 was not intended to be and was not full payment for all of the land, including lot B; and the transaction was not yet consummated when the final instalment of the purchase price was paid. Assuming that the city manager acted without prior authority from the council in executing the affidavit of April 23, 1964, and that the hospital (and the city) may have been laboring under the mistaken impression that the city manager was within his authority in providing that the city would pay for the fair value of additional construction if a repurchase of the land by the city was necessary, nevertheless reformation would not lie for the reasons we have stated.

2. The interlocutory decree is reversed, the judgment is reversed, and the case is remanded to the Superior Court where a judgment shall be entered in accordance with this opinion.

*So ordered.*

Mr. Chief Justice Tauro participated in the deliberation on this case, but retired before the opinion was issued.