CHIEF OF POLICE OF MEDFORD *vs.* CITY MANAGER OF MEDFORD.

Middlesex.   December 5, 1980. — February 23, 1981.

Present: BROWN, CUTTER, & PERRETTA, JJ.

*Municipal Corporations,* Officers and employees, By-laws and ordinances, Police. *Police. Medford.*

The city manager of Medford exceeded his powers under G. L. c. 43, §§ 103 and 104, by ordering a reorganization of the city's police department which would have effectively excluded the police chief from the chain of command from the city manager to the department in contravention of an ordinance providing that the chief "shall be the head of the department." [418-422]

CIVIL ACTION commenced in the Superior Court Department on August 22, 1979.

The case was heard by *Dolan,* J.

*Daniel F. Riley,* City Solicitor, for the defendant.

*John J. Twomey* for the plaintiff.

CUTTER, J.   Medford operates under a Plan E charter. G. L. c. 43, §§ 93 to 116, inclusive, as amended.   At the initiation on August 22, 1979, of this proceeding for declaratory relief, the defendant was city manager of Medford (the city manager), and the plaintiff was acting as the city's chief of police (the chief).   The controversy (concerning the authority and powers of the city manager and the chief, respectively, under the relevant statutory provisions constituting Medford's present charter and Medford's ordinances) arises out of the circumstances described below.

On August 17, 1979, the city manager sent to the chief a letter asserting that, as city manager, he had the "ultimate responsibility for creating an organizational structure in the [p]olice [d]epartment which, in his judgment, most effectively serves the needs of the [c]ity and the . . . [d]epartment." He then proposed a plan of reorganization, creating

two divisions within the police department, each to be headed by a captain to be selected by the city manager and to be designated as division commander. One division was to be responsible for line operations. The other was to be responsible for staff operations. Each division commander was to "be directly responsible to . . . [the chief] and the [c]ity [m]anager." The letter specified the functions to be performed within each division, and a police captain was designated by name in the letter as division commander of each division. A proposed table of organization was attached. The plan was to "be implemented on August 26."

To this letter, the chief replied on August 22 that he did not agree with the proposal. In his letter he asserted that the city manager does not have "authority to order such changes within the [d]epartment without . . . [the] consent" of the chief of police. He further asserted that the statutes, city ordinances, and departmental rules and regulations placed "responsibility for such control . . . in the [c]hief of [p]olice."

On the same day, the chief brought in the Superior Court this complaint. On August 24, 1979, he obtained a preliminary injunction which prevented the city manager from proceeding with the proposed reorganization until further order of the court. The pleadings allege essentially only the facts outlined above, referring in general terms to statutory and ordinance provisions discussed below.

The trial judge made findings and rulings and an order for judgment. In addition to facts already stated, she found in effect that, in the proposed reorganization, the chain of command would proceed not only from the city manager *through* the chief to the two division commanders, but would also flow from the city manager *directly* to each division commander, thereby bypassing the chief and "permitting the [city m]anager to . . . control the department through the two [d]ivision [c]ommanders." She also found that the city manager devised the reorganization in concert with the two police captains who were named as division commanders and that these two officers did not notify the

chief that they were going to confer with the city manager concerning police business or obtain his approval of their doing so, as required by § 85 of the police department's general regulations.

The judge concluded that the reorganization plan would isolate the chief from "direct control over the [d]ivision [c]ommanders and the line and staff officers serving under" them, "would displace the . . . [c]hief in substance although perhaps not in form," and would contravene the ordinances, the police department regulations, and the legislative intent with respect to the powers and duties of the city manager. She ordered entry of a judgment declaring (1) that the chief "has the sole authority, consistent with the terms and conditions set forth in" the Medford ordinances, "to control, supervise and assign police officers and other personnel within his command to any assignment or duty within the" department, and (2) that the city manager "may order a reorganization of the [p]olice [d]epartment . . . as chief administrative officer, provided that any reorganization ordered is consistent with the powers and rights reserved to the [c]hief . . . by [o]rdinance . . . and does not usurp the powers and control reserved to the" chief by the ordinance.[1]

The city manager appealed from the judgment. By order of a single justice of this court, the transcript[2] of evidence

---

[1] In earlier discussion, the judge said, "Reorganization of the departments within . . . Medford may well be an appropriate administrative function of the [c]ity [m]anager as the chief administrative officer," but such change "cannot be in violation . . . of the ordinances and regulations that the [c]ity [m]anager is bound to uphold" under G. L. c. 43, § 104 (see note 3, infra). As to the city manager's authority, she said that the city manager "stands in a position superior to that of all department heads including the [c]hief of [p]olice" who is accountable to the city manager. In instances where no ordinance reserves control to a department head, "the [city m]anager would have total administrative control . . . of those departments," but where "control is established by ordinance, as in the case of the [p]olice [c]hief, then the administrative authority, albeit a superior one, is restricted within the confines of the ordinance . . . ."

[2] The transcript shows the introduction by stipulation of the documentary evidence already mentioned and copies of various statutes and ordinances. It also contains the testimony (concerning the proposal) of one

has not been reproduced in the record appendix, but has been transmitted to us.

1. Medford became a city in 1892. See St. 1892, c. 324, which (as from time to time amended in respects not here relevant) was the basic charter of the city until Plan E was adopted in accordance with G. L. c. 43, especially §§ 2, 4, 5, 7-8, as amended. The provisions of the Plan E form of charter, here most pertinent, are G. L. c. 43, §§ 103-106. Relevant portions of these sections, originally inserted by St. 1938, c. 378, § 15, are set out in the margin.[3]

---

witness, asserted to be an expert on criminal justice. His testimony (admitted over the city solicitor's objection) was too general to be of assistance and seems largely irrelevant. We think the record presents only questions of law to be decided on the documentary evidence.

[3] General Laws c. 43, § 103, as amended through St. 1973, c. 128, reads in part: "The city council shall appoint a city manager . . . who shall be the *chief administrative officer of the city* and shall be *responsible for the administration of all departments* . . . and officers *of the city,* whether established before its adoption of this plan or thereafter, except that of the city clerk, city auditor, any official appointed by the governor or any body elected by the voters of the city. He shall be appointed on the basis of his administrative and executive qualifications only . . .. *He shall hold office during the pleasure of the city council* . . ." (emphasis supplied). An amendment (St. 1979, c. 478), subsequent to the events here discussed, is not relevant.

Section 104 reads in part: "Except as otherwise specifically provided in this chapter, it shall be the duty of the city manager to act as *chief conservator of the peace* within the city; to supervise the administration of the affairs of the city; to see that within the city the laws of the commonwealth and the *ordinances,* resolutions and regulations of the city council are faithfully executed; and to make such recommendations to the city council concerning the affairs of the city as may to him seem desirable . . . . He shall make all *appointments and removals* in the departments . . . of the city for whose administration he is responsible, except as otherwise provided in this chapter, and shall perform such other duties as may be prescribed by this chapter or be required of him by *ordinance* or resolution of the city council. The city manager shall have and possess, and shall exercise, all the powers, rights and duties, other than legislative, had, possessed or exercised, immediately prior to the adoption of this plan, by the mayor, board of aldermen, common council and all other boards, commissions and committees of the city and their members, severally or collectively, except such as are by this chapter conferred upon the school committee or are otherwise provided for thereby" (emphasis supplied).

Section 105 reads in part: "Such officers and employees as the city council, with the advice of the city manager, shall determine are nec-

2. The original charter (St. 1892, c. 324, § 39) gave the city council general power to "establish a police department and provide for the appointment of a chief of police and of other members of the police force, by the mayor . . . or for the appointment of other members of the force by a chief of police to be appointed by the mayor." The Medford ordinances as published in (and revised to) 1975, with due recognition that the mayor had been supplanted by the city manager, provide in c. 19, § 1, "The [p]olice [d]epartment shall consist of a [c]hief of [p]olice, five [c]aptains . . . [nine l]ieutenants, nineteen [s]ergeants, and such [p]atrolmen as may be from time to time provided. All members of the [p]olice [d]epartment shall be appointed by the [c]ity [m]anager in conformity with the [c]ivil [s]ervice laws."[4] Section 3 provided in part, "The Chief of Police shall be the head of the department *and subject to the general supervision and control of the City Manager,* shall have *control of the department, its officers and members* . . . and of constables when in the service of the city. He shall make such rules and regulations for the proper government of the department, as he may from time to time deem expedient,

---

essary for the proper administration of the departments . . . of the city for whose administration the city manager is responsible shall be appointed, and may be removed, by the city manager . . . . The city manager may authorize the head of a department . . . for whose administration he is responsible, to appoint and remove subordinates in such department . . . . All appointments by, or under the authority of, the city manager, if subject to chapter thirty-one and the rules and regulations made under authority thereof, shall be made in accordance therewith, and all other appointments . . . shall be on the basis of . . . ability and training and experience in the work to be performed."

Section 106 reads: "Officers and employees of the city appointed by, or under the authority of, the city manager shall perform the duties *required of them by the city manager,* under general regulations of the city council. Any violation of this section shall constitute sufficient grounds for removal of any such officer or employee" (emphasis supplied).

[4] The chief of police became subject to civil service, according to the 1943 revision of Medford's ordinances, at 290, by the acceptance at the annual election on November 7, 1911, of the provisions of St. 1911, c. 468 (incorrectly described in the revision as c. 368).

subject to the approval of the City Manager, and not repugnant to the laws of the Commonwealth or any ordinance of the city . . . . He shall devote all his time to the duties of his office, preserve peace and order, shall execute and enforce the provisions of General Laws, the special laws relating to the City, *the ordinances of the City Council, and the orders of the City Manager*" (emphasis supplied).

3. It was pointed out in *Allen* v. *Cambridge*, 316 Mass. 351, 353 (1944), that the Plan E legislation (St. 1938, c. 378, and St. 1941, c. 722, §§ 5-7) authorized "the adoption by a city of a new and radically different form of charter" and that, under it, the city manager was to have broad powers as "chief administrative officer of the city." It was stated also that, upon "the adoption of a new plan of charter, existing ordinances remain in force." G. L. c. 43, § 4. See *Sherriff* v. *Mayor of Revere*, 355 Mass. 133, 136 n.1 (1969).

4. There is some possible conflict between (and overlapping of) (a) the broad provisions of G. L. c. 43, § 103, as amended (note 3, *supra*) providing that the city manager "shall be responsible for the administration of all departments . . . of the city" (see *Shea* v. *Inspector of Bldgs. of Quincy*, 323 Mass. 552, 558 [1949]), and (b) the language of c. 19, § 3, of the city ordinances, that the chief of police "shall be the head of the department and subject to the general supervision and control of the [c]ity [m]anager, shall have control of the department, its officers and members." The claim of the city manager (that this possible conflict should be resolved in favor of his control of the chief and the department) receives some support from the provisions of c. 43, § 104 (note 3, *supra*), describing his duties as (a) including acting as "chief conservator of the peace within the city" and supervising "the administration of the affairs of the city," (b) authorizing him to "make all appointments and removals in the departments . . . of the city for whose administration he is responsible"; and (c) giving him "all the powers, rights, and duties, other than legislative," which the mayor and specified city bodies had exer-

cised prior to the adoption of Plan E. Sections 105 and 106 to some degree give the city manager additional authority.[5]

5. The possible conflict of authority, we think, can be resolved, for the purposes of this case, by appropriate recognition of the broad authority of the city manager to set general policy to be carried out by the chief and to supervise and control his actions, but without going so far as to empower the city manager to exclude the chief entirely from the chain of command from the city manager to the department. The trial judge correctly concluded that the reorganization plan proposed by the city manager "isolates and severs the control of the [c]hief from the department." To that extent, we are of opinion that the reorganization plan goes beyond the powers of the city manager under G. L. c. 43, §§ 103 and 104, because it is in violation of a directly relevant provision (already quoted in part 2 of this opinion) of c. 19, § 3, of the ordinances that the chief "shall be the *head* of the department" (emphasis supplied). The provision of the ordinance at least prevents the complete displacement (without civil service proceedings) of the chief as an effective department head in the city's administrative structure. Because he is subject to civil service, he of course cannot be removed except in accordance with G. L. c. 31, §§ 41-43, as amended. In this respect the plan violates the ordinance and a declara-

---

[5] Obviously, the city manager has a wide range of judgment and discretion in the exercise of his broad, highly varied powers. See *DeNunzio* v. *City Manager of Cambridge,* 341 Mass. 420, 422 (1960); *Welch* v. *Contributory Retirement Appeals Bd.,* 343 Mass. 502 (1962); *Curry* v. *Cambridge,* 351 Mass. 28, 29-30 (1966); *Sancta Maria Hosp.* v. *Cambridge,* 369 Mass. 586, 592-593 (1976); *Conway* v. *City Manager of Medford,* 5 Mass. App. Ct. 778 (1977). The precise scope of the city manager's powers is not established by the decided cases. It is clear that limits are imposed upon them not only by G. L. c. 43, and by valid provisions of ordinances, but also by the fact that the city manager serves "at the pleasure of the city council." See G. L. c. 43, § 103 (note 3, *supra*). See *Curry* v. *Cambridge, supra* at 29-30. There is indication in the legislative history that some proposals for the city manager's powers under Plan E were more broadly drafted than the provisions of § 104 which finally emerged in St. 1938, c. 378, § 15. See 1937 House Doc. No. 233; Res. 1937, c. 76; 1938 House Doc. No. 1710; 1938 House Bill No. 1710.

tion to that effect must be ordered. Beyond this point, the present record discloses no controversy requiring any present declaration or any present further reconciliation of the potential conflict between the statutory charter powers of the city manager and the provisions of the ordinance. See *Eve Corp.* v. *License Comm. of Worcester*, 372 Mass. 869 (1977). See also *Clinton Housing Authy.* v. *Finance Comm. of Clinton*, 329 Mass. 495, 498-499 (1952).

The relief granted by the trial judge goes beyond declarations essential to deal with the only plan now presented for consideration. It may well be that, if the city manager should purport to order the chief to assign particular subordinates to particular tasks, that order or proposal also would be in conflict with the ordinance and not justifiable by the broad statutory authority of c. 43, §§ 103-106. That question we need not decide now, in advance of any knowledge of the occasion for, and circumstances of, any such future order or proposal. We assume that, in most instances, the city manager, simply as a matter of sound municipal administration, will refrain from intervention in the details of police assignments and departmental operations. If he decides to make further proposals, as a matter of general policy and as the city's chief administrative officer, it will be time enough for the courts to declare the rights of the parties when any such proposal is made. In this uncertain area, it would be imprudent to make any declaration beyond that needed to dispose of the controversy originally alleged.

6. The judgment will be modified to declare only that the reorganization plan proposed by the city manager in August, 1979, in effect removing the chief of police from the chain of command between the city manager and the police department, is in conflict with the provisions of the Medford ordinances, c. 19, § 3, and, to that extent at least, is beyond the powers of the city manager. This case is remanded to the Superior Court for the entry of a judgment making such a modified declaration.

*So ordered.*