CHIEF OF POLICE OF CHELSEA *vs.* MAYOR OF CHELSEA.

Suffolk.    September 19, 1985. — January 29, 1986.

Present: BROWN, KAPLAN, & PERRETTA, JJ.

*Municipal Corporations,* Officers and employees, By-laws and ordinances, Police. *Police,* Authority of police chief. *Chelsea.*

Certain ordinances and regulations of the city of Chelsea, which had been established with the approval of the city's mayor and its board of aldermen, were effective to vest in the chief of police the authority to assign police officers to specific shifts, duties, and days of work, and were not in conflict with provisions of the city charter describing the mayor's duties as "chief executive officer of the city." [532-535]

CIVIL ACTIONS commenced in the Superior Court Department on January 11, 1984, and January 17, 1984, respectively.

After the cases were consolidated for trial, motions for summary judgment were heard by *Paul G. Garrity,* J.

*Evan Frost Gellar,* City Solicitor, for the defendant.
*Michael C. Lehane* for the plaintiff.

PERRETTA, J. Cross complaints seeking declaratory and injunctive relief were brought by the chief of police (chief) and the mayor in which each asserted the authority to make decisions concerning the designation of police officers to specific shifts, days off, and job assignments. The controversy raises the sole issue whether certain ordinances and regulations promulgated thereunder, cited by the chief as the source of his authority, are in conflict with the city charter, relied upon by the mayor. If conflict exists, the charter controls. See *Clarke v. Fall River,* 219 Mass. 580, 583 (1914). The complaints were consolidated, and on cross motions for summary judgment the judge concluded that the power claimed by both was vested in the chief and not the mayor. We affirm the judgments.

1. *The Charter and Ordinances.*

The charter of Chelsea is a special law, St. 1911, c. 680, Pt. II, the city never having adopted one of the charter forms provided for in G. L. c. 43. Section 3 of the charter provides, to the extent pertinent, that the "government of the city and the general management and control of all its affairs shall be vested in a single officer, to be called the mayor, and in a legislative body, to be called the board of aldermen." The powers of the mayor relevant to this controversy are set out in §§ 50 and 51. Section 50 describes the mayor as the "chief executive officer of the city" and "except as is otherwise provided herein," vests in the mayor "executive powers" which "shall be exercised by him, either personally or through the several officers and boards in their respective departments under his general supervision and control." The chief of police is appointed by the mayor, subject to the approval of the aldermen, and holds office until a successor is appointed. See § 51. Ordinances are established by the board of aldermen, and once approved by the mayor under § 42,[1] "continue in force until amended or repealed." § 40.

Section 13-4 of the revised ordinances declares that the "chief of police shall . . . have entire control of the [police] department, its officers and members, and of all constables and other officers when engaged in the service of the city, or when assigned by him to any special duty; subject, however, to the provisions of section [50] of the city charter." The chief is required by § 13-7 to enforce the ordinances and "orders of the mayor and board of aldermen." By § 13-9, power was conferred upon the chief to make "such rules and regulations for the conduct and control of the police department as he deems advisable, the same being subject to the approval of the mayor and board of aldermen."

On February 23 and 25, 1976, the aldermen and mayor, respectively, approved rules and regulations which define the chief's responsibilities and powers. Included among those

---

[1] If not approved, the ordinance may nonetheless pass upon a vote of approval by "two thirds of the members of the board" of aldermen. § 42.

therein set out are designations of police officers to specific shifts, days off and job assignments, or, as characterized by the chief (and fairly, we think), the authority to "make daily operational decisions."[2]

2. *Discussion.*

In determining whether the mayor's actions relative to the police department fall within the scope of the executive powers conferred upon him by § 50 of the charter, we apply well-established principles of statutory construction. It is our function to construe the charter and ordinances together so that they constitute a harmonious whole consistent with the purpose of their enactment. In so doing, we look first to the language of the pertinent provisions, keeping in mind that a literal construction will not be adopted "when that construction would be inconsistent with other material provisions of the statute and would defeat the aim and object of the legislation." *Lexington* v. *Bedford,* 378 Mass. 562, 570 (1979). See also *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds,* 382 Mass. 580, 585 (1981).

Pointing to § 50, the mayor contends that the city's executive powers were intended to vest exclusively in the mayor, as the "chief executive officer of the city."[3] We think, however, that

---

[2] More specifically, § II.A of the Rules and Regulations for the Government of the Police Department of the city of Chelsea states that the chief is the "final departmental authority in all matters of policy, operations, and discipline. He exercises all lawful powers of his office and issues such lawful orders as are necessary to assure the effective performance of the Department." Further particularization is found in §§ II.B(2), (3), (4), and (5), which speak to the chief's duty to "[o]rganize, direct, and control all resources of the Department," "[d]evelop the organizational structure of the Department in accordance with professional standards," "[e]stablish a routine of daily duties to be performed by officers as designated by him," and "[a]ssign, detail or transfer any member or employee of the Department to or from any unit or assignment whenever he shall deem such action to be in the best interest of the efficiency, discipline or morale of the Department."

[3] We find it of no particular significance that the mayor is described in § 50 as the "chief executive officer of the city." See 3 McQuillin, Municipal Corporations § 12.41 (3d ed. rev. 1982) ("The chief officer or executive and administrative head of a municipal corporation is commonly styled the mayor").

any notion of exclusivity is dispelled by that part of § 50 which provides that executive powers vest in the mayor "except as is otherwise provided herein." Section 57 of the charter, for example, confers upon the board of aldermen executive power similar to that granted the mayor under § 50, the power to make appointments. See *Bailen* v. *Assessors of Chelsea,* 241 Mass. 411, 416 (1922). Additionally, the most common use of the term "executive power" is in contradistinction to legislative and judicial power. See *Selectmen of Milton* v. *District Court of E. Norfolk,* 286 Mass. 1, 4-6 (1934), and cases therein discussed. In this sense, executive power indicates the authority to formulate general policy and to make decisions in furtherance of that policy. See *Yunitz* v. *Chelsea,* 270 Mass. 179, 181 (1930).[4] Cf. *Rollins* v. *Salem,* 251 Mass. 468, 471 (1925).

Moreover, construing the term "executive powers" as meaning managerial powers in general, rather than in every detail, is consistent with § 3 of the charter, which, as earlier noted, places the "government of the city and the *general* management and control of all its affairs" in the mayor "*and* in a legislative body," the board of aldermen (emphasis supplied). The only specific power granted the mayor by the charter in respect to the chief of police is that found in § 51; the chief is appointed by the mayor (subject to the approval of the board of aldermen) who may also remove him "for such cause as he shall deem sufficient."[5] The remaining charter sections which speak to the powers of the mayor may be described as relating to the efficient and economical administration of the affairs of Chelsea.[6]

---

[4] In *Yunitz,* the court concluded that the fact that § 61 of the charter authorized the superintendent of public buildings to employ labor did not prevent the mayor from exercising his executive power § 50 "to practice economy for the general welfare . . . [and] from exercising in good faith the highly important and laudable abolition of an unnecessary position within that department." *Id.* at 181.

[5] By § 75 of the charter, G. L. c. 31, the civil service law, "shall have full force, application and effect in the said city." As to how the civil service law applies to chiefs of police, see G. L. c. 31, §§ 48 and 51.

[6] See *Brady* v. *Brady,* 380 Mass. 480, 484 (1980) ("There is, of course, a 'maxim of statutory construction which suggests that a statutory expression

Although we respect the mayor's position of chief executive officer of the city, we see nothing in §§ 50 or 51 which authorizes him to direct in every detail the day to day affairs of the police department. *Chief of Police of Medford* v. *City Manager of Medford,* 11 Mass. App. Ct. 415, 420-421 (1981), provides analogous support for our reading of the charter as consistent with the ordinances. There the ordinance provided that the "chief of police 'shall be the head of the department and subject to the general supervision and control of the [c]ity [m]anager, shall have control of the department, its officers and members.'" Relying upon the "broad powers" conferred upon him as "chief administrative officer of the city" under a Plan E form of charter, see G. L. c. 43, §§ 103-106, the city manager claimed control of the chief and the department and attempted to reorganize the department in a manner which, much as in the present case, conflicted with the chief's authority conferred by the ordinance. In resolving the "possible conflict of authority" the court recognized the "broad authority of the city manager to set general policy to be carried out by the chief and to supervise and control his actions, but without going so far as to empower the city manager to exclude the chief entirely from the chain of command from the city manager to the department." *Id.* at 421.

We think it important to point out that, in reaching our conclusion, we have not considered the scope of the mayor's executive powers under the charter in any context other than as they relate to the specific ordinances relied upon by the chief in asserting his authority to assign members of the department to days off and to specific shifts and jobs. As those ordinances do not conflict with any of the mayor's executive powers conferred upon him by §§ 50 and 51 of the charter, we

of one thing is an implied exclusion of other things omitted from the statute.' *Harborview Residents' Comm., Inc.* v. *Quincy Housing Authy.,* 368 Mass. 425, 432 [1975], and cases cited. However, as we noted in *Harborview,* 'the maxim is not to be followed where to do so would frustrate the general beneficial purposes of the legislation'").

conclude that the specific authority here in dispute is vested in the chief by those ordinances.

*Judgments affirmed.*