# United States Court of Appeals
## For the First Circuit

No. 13-2012

FIRST AMERICAN TITLE INSURANCE COMPANY,

Plaintiff, Appellee,

v.

LANE POWELL PC,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter,[*] Associate Justice,
and Thompson, Circuit Judge.

John R. Neeleman, with whom Lane Powell PC and Steven A. Ross
were on brief, for appellant.
Jason A. Manekas, with whom Bernkopf Goodman LLP was on brief,
for appellee.

August 22, 2014

---

[*]  Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

**TORRUELLA, Circuit Judge.** Defendant-Appellant Lane Powell PC ("Lane Powell") appeals the District Court of Massachusetts' grant of summary judgment in favor of Plaintiff-Appellee First American Title Insurance Company ("First American"). Lane Powell, a Washington-based law firm, contracted with First American for the latter to provide title insurance on two mortgages that Lane Powell took as security from Charles Crovo ("Crovo"), a client who was indebted to Lane Powell for a considerable amount of attorney's fees. Though the letter of the insurance policies in question seemingly provides coverage for priority liens, First American denied Lane Powell coverage upon foreclosure of liens that were superior to those of Lane Powell.

Upon Lane Powell's request for indemnification, First American sought declaratory judgment in Massachusetts state court, essentially arguing that coverage for priority liens was never intended by either party. Lane Powell removed the action to federal district court. On cross-motions for summary judgment, the district court granted judgment in favor of First American. Ruling from the bench, the district court found that because Lane Powell was aware of the prior mortgages, it could not expect to receive coverage it did not bargain for. We agree.

## I. Background

Charles Crovo and others engaged Lane Powell for legal representation regarding a number of commercial disputes that are

unrelated to this matter. As Lane Powell's unpaid invoices for attorney's fees accumulated, Lane Powell and Crovo entered into an amended fee arrangement in April of 2011. By way of the arrangement, Crovo granted mortgages to Lane Powell over two properties in Massachusetts as security for payment of the fees owed -- the West Tisbury Mortgage and the Newton Mortgage.

There was some discussion between Crovo and Lane Powell regarding the equity on the West Tisbury and Newton properties, as well as regarding liens on both properties that would be superior to Lane Powell's mortgages. Lane Powell understood that these superior liens would take priority over its mortgages and accepted the inferior positions.

In August of 2011, Lane Powell retained a Massachusetts firm, Coogan Law Office ("Coogan"), to examine title to the West Tisbury and Newton properties, to assist Lane Powell with recording a mortgage over each property, and to facilitate the issuance of a lender's policy of title insurance for each property in favor of Lane Powell. For purposes of the tasks requested of Coogan, paralegal Kate Iiams ("Iiams") of Lane Powell, and employees Lori Pfingst and Jennifer Cutrer of Coogan handled most communications. There was apparently little or no direct dialogue between the attorneys of each firm.

Coogan carried out the title searches for each property and reported to Lane Powell that the West Tisbury property was

encumbered by a mortgage in favor of ING Bank ("ING Mortgage"), and the Newton property was encumbered by two mortgages -- one in favor of JP Morgan Chase Bank ("Chase Mortgage") and one in favor of Raymond C. Green, Inc. ("Green Mortgage").

On or about September 7, 2011, Coogan provided Lane Powell with a commitment for title insurance ("West Tisbury Commitment") and a draft title insurance policy for the West Tisbury Property ("Draft West Tisbury Policy"). The West Tisbury Commitment identifies the ING Mortgage as an encumbrance to be discharged. The Draft West Tisbury Policy, however, does not specifically except the ING Mortgage from coverage.

On September 7, 2011, Iiams of Lane Powell wrote Coogan to inform him that Lane Powell did not "expect the existing lien of $1,950,000 with ING Bank to be paid off or released on the [West Tisbury] property." Jennifer responded on behalf of Coogan that "if that mortgage is remaining and the mortgage we are putting on will be in addition to that one then we have to charge the full rate." On September 13, 2011, First American, by way of its agent Coogan, issued the West Tisbury policy of title insurance ("West Tisbury Policy") to Lane Powell. Like the West Tisbury Commitment, the West Tisbury Policy does not specifically except the ING Mortgage from coverage.

Coogan never provided Lane Powell with a commitment for title insurance or a draft policy for the Newton property, though

it did inform Lane Powell of the Chase and Green Mortgages that encumbered the Newton property when it reported on the results of its title search in August of 2011. On October 30, 2011, Lori from Coogan wrote Iiams from Lane Powell and asked whether Lane Powell intended to pay off the Chase and Green Mortgages: "will this mortgage be paying off any of the outstanding mortgages on the property? (in order to qualify for a refinance rate?)." In response, Iiams, on behalf of Lane Powell, confirmed it would not be paying off any existing mortgages on the Newton property. On March 30, 2012, Coogan relayed to Lane Powell a policy of title insurance for the Newton Property ("Newton Policy"). The Chase and Green Mortgages are not excepted from coverage under the Newton Policy.

Crovo defaulted on his debt to Lane Powell, as well as on debts owed to ING Bank and Raymond Green, Inc., leading the latter two to foreclose on their respective mortgages over the West Tisbury and Newton properties. Lane Powell recovered no proceeds from these foreclosures. On October 3, 2012, Lane Powell notified First American of its claim under the Newton Policy. First American responded on October 5, 2012, informing Lane Powell that First American would afford it coverage according to the terms of the Newton Policy. Shortly thereafter, however, on November 9, 2012, First American reneged, and it denied coverage under the Newton Policy. As to the West Tisbury Policy, though it remains

unclear when exactly the parties discussed the matter, First American denied coverage from the outset.

First American filed for declaratory judgment in Massachusetts state court, seeking reformation of the West Tisbury and Newton Policies on grounds of mutual mistake. First American also argued that a clause in the policies, Exclusion 3(a), excludes from coverage the mortgages superior to Lane Powell's. The underlying theory is that the true intent of both parties was to except the superior liens from coverage under the policies. The policies do not read this way, First American contends, because of a mere clerical error overlooked by First American when it reduced the policies to writing -- a simple case of scrivener's error.

Lane Powell removed the action to the District Court of Massachusetts and discovery ensued. The parties elicited deposition testimony from Brian Powell ("Powell") and John Neeleman ("Neeleman"), both partners at Lane Powell, and from Iiams.

Powell reviewed title to the West Tisbury and Newton properties in connection with Lane Powell's efforts to record its mortgages and secure title insurance over both properties. Powell testified that he was aware that both properties were encumbered by mortgages that would be superior to Lane Powell's. He also understood that, because of Lane Powell's inferior position, its potential to recover proceeds from the foreclosure of superior liens depended on the amount of equity in each property. Powell

thus conceded that Lane Powell's mortgages would be in junior positions and that foreclosure of the senior liens might result in no recovery for Lane Powell at all.

Neeleman's written communications to Powell show that he was also aware that Lane Powell's mortgages would be inferior to prior encumbrances on both the West Tisbury and Newton properties. Neeleman also testified, however, that in his mind, the rank of Lane Powell's mortgages in the land registry bore no relation to the title insurance policies. Finally, Neeleman testified that, upon receiving notice of the foreclosures, he reviewed both title insurance policies and "thought it was interesting" that they did not except the prior mortgages from coverage.

Iiams testified that she was charged with inquiring with Coogan as to the price of the Newton Policy, and that she understood that the policy premium would be higher if Lane Powell decided not to pay off the prior mortgages. Thus, Iiams was also aware of the senior mortgages.

Lane Powell moved for summary judgment on May 29, 2013. Lane Powell argued that the prior mortgages in question are not excepted from the West Tisbury or Newton policies, and, as per the letter of the policies, First American must provide it coverage. First American cross-moved for summary judgment, advancing its theory that despite the letter of the policies, neither it nor Lane

Powell ever intended that the mortgages superior to Lane Powell's would be covered under the policies.

The district court held a hearing on the parties' cross-motions and, from the bench, granted summary judgment in favor of First American. As to the district court's reasoning, we are left only with the following words the court addressed to counsel for Lane Powell: "You people are attorneys here, and you agree that they had knowledge, but you say that because of this error First American is on this policy to make, to reimburse you for a situation of which you had knowledge." Lane Powell's timely appeal followed.

## II. Discussion

Review of a district court's grant of summary judgment on cross-motions for summary judgment is de novo. Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004). "Cross-motions for summary judgment require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 559 (1st Cir. 2010) (alterations and internal quotations marks omitted).

We sit in diversity jurisdiction, and thus apply the law of Massachusetts to this case. OneBeacon America Ins. Co. v. Travelers Indem. Co. of Ill., 465 F.3d 38, 41 (1st Cir. 2006).

## A. <u>Reformation and mutual mistake</u>

The facts, as they have been recited, are essentially undisputed. First American claims it is not liable to Lane Powell under the Newton or West Tisbury policies. Despite the letter of the policies to the contrary, First American says that the parties' intent was to except from coverage the ING Mortgage from the West Tisbury Policy, and the Chase and Green Mortgages from the Newton Policy -- the letter of the policies is the result of a mutual mistake. Accordingly, First American would have us reform the policies and except these liens from coverage, so as to reflect what it purports was the true intent of the parties: to insure Lane Powell against the risk of defects in title arising from encumbrances other than the existing senior mortgages.

"Insurance policies may be reformed under the same principles as any other contract." <u>Caron</u> v. <u>Horace Mann Ins. Co.</u>, 466 Mass. 218, 222, 993 N.E.2d 708, 711 (2013). "In order to prevail on a motion for summary judgment on a claim for reformation due to mutual mistake, the moving party must establish that the undisputed material facts fully, clearly, and decisively show a mutual mistake." <u>Id.</u> at 221 (citation omitted); <u>OneBeacon</u>, 465 F.3d at 41 ("The critical limitation in a contract reformation case is the burden of proof: to be entitled to reformation, a party must establish that the undisputed facts fully, clearly, and decisively show a mutual mistake."). "The mutual mistake doctrine exists to

effectuate the agreement intended by the parties to a contract where the contract language fails to capture that agreement." <u>Caron</u>, 466 Mass. at 223. "Central to this doctrine is the fundamental underpinning that the parties had reached an agreement on a point which they intended to enshrine in the written contract but which, for some reason, was mistakenly omitted from that written contract." <u>Id.</u> A court will not grant reformation unless the movant has shown "that the parties expressed agreement and an intention to be bound in accordance with the terms that [it is] asked to establish and enforce." <u>Sancta Maria Hosp.</u> v. <u>City of Cambridge</u>, 369 Mass. 586, 595, 341 N.E.2d 674, 681 (1976); <u>see also</u> <u>Caron</u>, 466 Mass. at 223-24.

First American posits that Lane Powell unequivocally assented and agreed to policies that excepted from coverage the ING Mortgage and the Chase and Green Mortgages, respectively. This is made clear, First American argues, by the acts of Lane Powell leading up to the recording of the mortgages and issuing of the West Tisbury and Newton Policies. In the words of First American, Lane Powell was aware of the senior mortgages, was told by Crovo that its mortgages would occupy junior positions, "confirmed its own understanding it would occupy junior positions, had its own real estate department review title and analyze the equity available for such junior positions, confirmed both internally and externally to both its counsel and First American's issuing agent

-10-

that it would not be satisfying the senior mortgages, and then recorded its mortgages." First American argues that this evinces Lane Powell's consent to except these prior mortgages from coverage. According to First American, the letter of the West Tisbury and Newton Policies -- not excepting the prior mortgages from coverage -- is the result of a clerical error by First American and does not represent the true intent of either party. Therefore, First American suggests that if the policies are not reformed, Lane Powell stands to receive a windfall that neither party ever intended or bargained for.

First American's reformation argument fails, squarely. Chiefly, it cannot point to any evidence on the record that Lane Powell ever agreed to, much less manifested an intent, to have the ING, Chase, or Green Mortgages excepted from the West Tisbury and Newton Policies, respectively. Sancta Maria, 369 Mass. at 596. The evidence indicates that Lane Powell was indeed aware that its mortgages would occupy junior positions to the record mortgages already existing on the West Tisbury and Newton properties. First American would have us conclude that this amounts to Lane Powell's consent to except these superior mortgages from the policies. Nonetheless, as the record shows, Lane Powell never conveyed any such consent to First American.

Specifically as to the West Tisbury property, Lane Powell knew from its initial negotiations with Crovo that the property was

encumbered by an existing mortgage. Coogan confirmed to Lane Powell the existence of the ING Mortgage. Lane Powell readily assumed the subordinate rank for its mortgage.

Coogan then issued to Lane Powell the West Tisbury Commitment and the West Tisbury Draft Policy. Though the West Tisbury Commitment required that Lane Powell discharge the ING Mortgage, the record does not show that the parties exchanged any thoughts on this particular document. Regardless of Lane Powell's awareness of the contents of the West Tisbury Commitment, it made no manifestation to First American that it agreed to except the ING Mortgage from coverage.

Subsequently, before issuance of the West Tisbury Policy, and in response to Lane Powell's indication that it would not be paying off the ING Mortgage, Coogan indicated that "if that mortgage is remaining and the mortgage we are putting on will be in addition to that one then we have to charge the full rate." This is perhaps a suggestion from First American's agent to Lane Powell that, given Lane Powell's decision to not discharge the ING Mortgage, coverage would extend and the resulting premium would be higher. Indeed, First American issued the West Tisbury Policy shortly afterwards, with no exception for the ING Mortgage, and it charged Lane Powell the higher premium. Notwithstanding whatever this exchange might have meant to either party, it certainly does not "fully, clearly, and decisively show" that Lane Powell

-12-

communicated to First American that it consented to an exception for the ING Mortgage. See Caron, 466 Mass. at 222 (internal quotation marks omitted).

The Newton Policy involved a similar narrative. First American admittedly did not provide Lane Powell with a commitment or a draft policy during the Newton Policy negotiations. A similar exchange did take place between Lane Powell and Coogan regarding coverage, discharge of prior liens, and the premium to be charged. Coogan asked whether Lane Powell intended to pay off the Chase and Green Mortgages "in order to qualify for a refinance rate." Iiams responded on behalf of Lane Powell that it would not be discharging the existing mortgages on the Newton Property. Coogan, on behalf of First American, issued the Newton Policy to Lane Powell with no exception for the Chase or Green Mortgages and charging the higher premium. There is no indication that Lane Powell manifested to First American that it agreed to except the Chase and Green Mortgages from coverage.

We stress that, for purposes of Lane Powell's negotiations with Crovo and its interactions with Coogan related to the title searches and recording of mortgages over the West Tisbury and Newton properties, it is undisputed that Lane Powell accepted that the West Tisbury Mortgage would be subordinate to the ING Mortgage, and that the Newton Mortgage would be subordinate to the Chase and Green Mortgages. Nonetheless, these undisputed facts are

not probative of Lane Powell's purported manifestation of its expectation that the ING, Chase, and Green mortgages would be excepted from coverage. Caron, 466 Mass. at 222.

### B. Exclusion 3(a)

First American also argues that since Lane Powell agreed with Crovo to assume mortgages with inferior positions on both the West Tisbury and Newton Policies, any loss due to the foreclosure of any of the superior mortgages is excluded from coverage by Exclusion 3(a). Exclusion 3(a) is a clause within a section of the respective policies titled "Exclusions From Coverage." It provides that: "The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage which arise by reason of: 3. Defects, liens, encumbrances, adverse claims or other matters: (a) created, suffered, assumed or agreed to by the Insured Claimant." Exclusion 3(a) is standard language in most title insurance policies.

Ostensibly, the letter of Exclusion 3(a) would seem to bar coverage of the ING, Chase, and Green mortgages. Lane Powell indeed agreed with Crovo to take out mortgages over the West Tisbury and Newton properties that were inferior in rank to the existing mortgages on both properties. Furthermore, Powell's and Neeleman's own testimony confirms Lane Powell's knowledge of the superior ING, Chase, and Green mortgages, and that its own mortgages over the West Tisbury and Newton properties would be in

-14-

junior positions, respectively. It is clear then, that Lane Powell "assumed" and "agreed to" junior positions for the West Tisbury and Newton Mortgages. Nat'l Cred. Union Admin. v. Ticor Title Ins. Co., 873 F. Supp. 718, 728 (D. Mass. 1995) (holding that the insured-mortgagor "suffered, assumed or agreed to" an existing superior mortgage where officers were aware of the superior mortgage and agreed to a junior position, thus barring coverage under Exclusion 3(a) despite error in title insurance policy).

In Ticor, plaintiff National Credit Union Administration ("NCUA"), a liquidating agent and successor to a defunct credit union and, consequently, an insured-mortgagor under a title insurance policy issued by defendant Ticor to the credit union, sought declaratory judgment that the title policy it held was in full force and effect. Id. at 720. The title insurance policy listed the former credit union's lien as a first mortgage, even though a superior mortgage encumbered the property offered as security to the extant credit union -- the result of a clerical error on the part of Ticor. Id. at 722. NCUA's suit was prompted by foreclosure of the prior mortgage. Id. Ticor, the issuer of the title insurance policy, countered that, since the credit union was aware of the prior mortgage and agreed to a junior position with the debtor and owner of the encumbered property, Exclusion 3(a) applied to bar coverage for foreclosure of the prior lien. Id. at 726. The district court held in favor of Ticor, finding

that the credit union's officers were aware of the prior mortgage and knowingly agreed to a junior position. Id. at 728 ("Given the extensive involvement of the officers in arranging for the two mortgages, the undisputed evidence supports Ticor's position that [the credit union]'s officers intentionally 'suffered, assumed, or agreed to' the first mortgage."). A contrary outcome, the court reasoned, would result in an unwarranted and entirely unintended windfall for the insured. Id.

Consistent with this reasoning, we find that First American has carried its burden of showing that Exclusion 3(a) applies and, accordingly, the policies do not provide coverage for the ING, Chase, or Green Mortgages. See id. at 726 (citing Todisco v. Nat'l Fire Ins. Co. of Hartford, 356 Mass. 736, 736-37, 254 N.E.2d 787, 788 (1970)). First American has put forth testimony from two witnesses, both partners at Lane Powell, who -- although to varying degrees -- were directly involved in equity and title analysis of both the Newton and West Tisbury properties, and who candidly admitted that they were well aware that Lane Powell's mortgages would be junior to the ING, Chase, and Green Mortgages. An insured party "assumes" or "agrees" to a lien pursuant to Exclusion 3(a) when it takes property that is subject to an existing encumbrance it has knowledge of. See Am. Title Ins. Co. v. E. W. Fin., 16 F.3d 449, 455-56 (1st Cir. 1994); Lawyers Title Ins. Corp. v. Doubletree Partners, L.P., 739 F.3d 848, 868 (5th

-16-

Cir. 2014) ("An insured only 'assumes' the defect if it has 'knowledge of the specific title defect assumed.'"). It is clear then, that Lane Powell "assumed" and "agreed to" the prior mortgages on the West Tisbury and Newton properties. See Ticor, 873 F. Supp. at 728.

To find otherwise would effectively morph the title insurance the parties agreed to into a credit insurance policy of sorts that Lane Powell did not pay for, and that neither party intended. More importantly, extending coverage to the loss incurred by Lane Powell caused by the foreclosure of the superior mortgages would result in a windfall to Lane Powell that neither party ever expected or agreed to. See id. (citing Brown v. St. Paul Ins. Corp., 634 F.2d 1103, 1107 n.8 (8th Cir. 1980)). Equity will simply not have it.

Lane Powell mounts two challenges to this result, both unpersuasive. First, Lane Powell contends that under Chicago Title Ins. Co. v. Resolution Trust Corp., 53 F.3d 899 (8th Cir. 1995), in order to avoid coverage and for Exclusion 3(a) to apply, First American must show that Lane Powell engaged in affirmative misconduct. To the extent that Chicago Title is an Eighth Circuit case based entirely on Minnesota law, we are not bound by the learned court's reasoning in that case, though we may opt to find it persuasive. More importantly, however, and contrary to Lane Powell's rather nearsighted reading, Chicago Title does not stand

for the proposition that, in order for Exclusion 3(a) to apply, the insurer must show intentional misconduct on the part of the insured.  Though our sister circuit recognized that other courts have taken slightly varying views on the matter, it squarely held that Exclusion 3(a) "bars coverage where there has been misconduct or inequitable behavior on the part of the lender" as well as "where the lender assumes or agrees to liens, or where the lender stands to receive an inequitable windfall."  Id. at 905.

Second, Lane Powell argues that First American cannot marshal evidentiary support for its Exclusion 3(a) theory because an integration clause in the West Tisbury and Newton Policies bars the use of parol evidence to show that Exclusion 3(a) applies. This flight of fancy fails as a matter of logic.  The parol evidence rule prohibits the use of evidence of prior or contemporaneous agreements that is proffered in an attempt to challenge, change, or broaden an integrated writing.  See, e.g., Gifford v. Gifford, 354 Mass. 247, 249, 236 N.E.2d 892, 893 (1968). However, First American's evidentiary effort serves to forward its theory of why Exclusion 3(a) applies -- which the parol evidence rule does not prohibit -- and is not an affront to the letter or meaning of the clause.

### III. Conclusion

First American has not shown that Lane Powell ever communicated its expectation that the superior mortgages over the

West Tisbury and Newton properties would be excepted from coverage. However, First American has conclusively shown that Lane Powell was well aware that its bargain with Crovo for security of its debt would result in junior mortgages. Exclusion 3(a) clearly excludes such encumbrances from coverage. Accordingly, the district court's grant of summary judgment in favor of First American is affirmed.

**AFFIRMED.**