Somerset Savings Bank *v.* Chicago Title Insurance Co.

SOMERSET SAVINGS BANK *vs.* CHICAGO TITLE INSURANCE COMPANY.

No. 93-P-154.

Suffolk. March 8, 1994. - July 27, 1994.

Present: FINE, KAPLAN, & IRELAND, JJ.

Further appellate review granted, 418 Mass. 1108 (1994).

*Insurance*, Title insurance. *Real Property*, Title insurance, Conveyance. *Practice, Civil*, Summary judgment.

In an action for declaratory and other relief brought by a bank holding a note secured by a mortgage on certain property against a title insurance company, summary judgment was inappropriately entered where there remained two issues of material fact: whether the fact that the property had been formerly used by a railroad company, obvious on the land record, taken together with the conveyancer's familiarity with G. L. c. 40, § 54A, was sufficient notice to remove the case from an exclusion of coverage [86-89]; and whether a custom and usage of title insurers, known by local conveyancers, to disclose all relevant matters revealed by the title search would provide support for the claim that the insurer voluntarily assumed an obligation outside the terms of the policy [89-91].

CIVIL ACTION commenced in the Superior Court Department on February 14, 1991.

The case was heard by *Patti B. Saris*, J., on a motion for summary judgment.

*David L. Klebanoff* for the plaintiff.

*Gordon M. Orloff* for the defendant.

KAPLAN, J. The plaintiff Somerset Savings Bank (Bank) in 1986 undertook to finance the acquisition by a developer of property located at 190 North Shore Road, Revere. The Bank further agreed to finance the construction of seventy-two condominium units on the property. In consequence, the Bank was to become the holder of a note in the amount of $9.5 million secured by a mortgage of the land and any improvements.

The Bank engaged the law firm of Grant & Artesani, P.C., to assist in closing the transaction, that is, to search the record to assure that the mortgage interest did not suffer from any defect, to certify to the Bank regarding the matter, and to obtain appropriate title insurance. The lawyers gave the favorable certification to the Bank. The Bank did not request or instruct that the title insurance should be obtained from any particular insurance company. However, the lawyers were approved agents of the defendant Chicago Title Insurance Company (Chicago Title), a foreign insurer with a branch in Boston. As agents, the lawyers were authorized to sell and issue title policies on behalf of the company. So, in respect to the Bank's mortgage loan, the lawyers on May 18, 1987, issued to the Bank a "loan policy" No. 22 0468 02 000026 of Chicago Title in the face amount of $9.5 million.[1] (The record on appeal does not make clear whether the policy passed through the Boston office before it was issued by the lawyers.) The lawyers were entitled to compensation for their work for the Bank and would also share, by way of commissions, in the insurance premium paid by the Bank.

Construction proceeded on the site under a building permit of the city of Revere issued in June, 1987, and by June 8, 1988, the Bank had paid out over $5 million of the construction loan money.

On June 3, 1988, the Attorney General's department wrote to Revere requesting that the city halt construction on the property. Accordingly, on June 8, 1988, the city issued a cease and desist order directed to the owners. Construction stopped and has not resumed. The basis for the stop was G. L. c. 40, § 54A, set out in the margin.[2] This provides in

---

[1] Under the lawyers' agency agreement with Chicago Title, they had general authority to issue policies up to $500,000 in face amount. They needed and secured particular authorization to issue the larger policy here.

[2] General Laws c. 40, § 54A, as inserted by St. 1973, c. 963, provides in pertinent part as follows: "If a city or town or any other person purchases any lands formerly used as a railroad right-of-way or any property appurtenant thereto formerly used by any railroad company in the commonwealth, no permit to build a structure of any kind on land so purchased shall be issued by any city or town in the commonwealth without first obtaining, after public hearing, the consent in writing to the issuance of such

substance that where land was formerly used as a railroad right of way, no permit to build on the land shall be issued by a city or town without securing the consent in writing, after public hearing, of the Executive Office of Transportation and Construction (EOTC). In fact, part or all of the instant property in Revere was owned by the Boston & Maine Railroad in 1926, and § 54A applied. The hurdle to resuming construction has not been overcome, although proposals for changes in the project that might be acceptable to the EOTC have been discussed from time to time.

It is quite likely that Grant & Artesani were at fault in failing to notice that the intended construction would be in violation of § 54A. The previous railroad relationship would be readily observed by a searcher tracing title in the land registry. The statute is not recondite; it is well known to local conveyancers and is within the ordinary range of their observation. But there was no mention of the statute anywhere in the policy, possibly because nothing about the statute and its bearing on the locus appeared in the lawyers' report of the title which would form the basis for writing the policy.

The Bank has commenced a protective action in Superior Court against Grant & Artesani and the members of the firm charging negligence and breach of contract.

The present action is by the Bank against Chicago Title and tests whether the latter bears any legal responsibility for the situation (among the demands is one for declaratory relief). The claims made in the complaint lie in contract and tort (negligence and negligent misrepresentation). The answer consists largely of denials. After considerable discovery, Chicago Title moved for summary judgment. The judge allowed the motion with an orderly memorandum. The Bank appeals. We hold that on the record made by the parties on summary judgment there are two issues left open and still to be resolved. Whether further proceedings will alter the result must abide the event.

---

permit from the secretary of the executive office of transportation and construction."

The title policy at bar — a policy form of the American Land Title Association as revised through 1984 — is arranged thus. The company insures against loss sustained by the insured by reason of certain stated casualties. This insurance, however, is subject to certain "Exclusions from Coverage" and also Schedule B "General Exceptions" and "Special Exceptions" (the specials are written into the policy, adapted to the particular case). The policy goes on to set out a dense collection of "conditions and stipulations."

The judge below read the policy as being one of indemnity, that is, the insurer undertakes to cover the stated casualties, as circumscribed by the exclusions and exceptions, if any should eventuate, but it does not give any warranty or guarantee of a perfect title. As to Grant & Artesani, the judge indicated that, wearing their hat as counsel to the Bank and rendering their favorable opinion to their client, they do naturally warrant the title and possibly other things; yet, wearing their other hat as agents of Chicago Title, they do not bind the company to any like warranties even though their research is the base for the writing of the policy.

For purposes of the present appeal, we may, in general, accept the judge's characterization of the policy, and also accept the judge's delineation of the dual roles of the lawyers — although it is plain (and becoming better understood) that the lawyers in the particular setup described are placed, or place themselves, in a conflicted situation.[3]

The judge held, in respect to the Bank's contract claims, that the casualty represented by the § 54A predicament was an excluded risk by the terms of the policy; and, in respect to the negligence claims, the company under the policy was not burdened with any duty to inspect or certify or insure the soundness of the title. Further, the judge said the company

---

[3]The type of arrangement used locally by Chicago Title is considered in D. Barlow Burke, Jr.'s treatise, Law of Title Insurance § 1.2.3 (2d ed. 1993). The conflict may arise initially in the lawyers' selecting a title company which they serve as agent, and again in the writing of the policy, where the interests of the insured may diverge from the company's interests and where negotiation would ordinarily be called for.

had not voluntarily assumed any obligation outside the terms of the policy.

As noted, we have specific differences with the judge's analysis.

1. In the treatment of certain exclusions, the judge is untroubled, but we find ambiguity.

As to coverage, Chicago Title "insures . . . against loss or damage . . . sustained or incurred by the insured by reason of:

.   .   .

"(2) Any defect in or lien or encumbrance on such title;

.   .   .

"(4) Unmarketability of such title. . . . "

The judge expresses some doubt whether the impediment created by § 54A represents a defect of or incumbrance on title or renders the title unmarketable — or, to the contrary, is merely a condition that has a negative effect on the value of the property. Possibly because the § 54A flaw appears on the land record, and is found by search of the title (and is, moreover, very serious in its impact), the judge goes on to assume that there was coverage under (2) or (4) or both.

The judge then consults the exclusions from coverage. These were in part as follows:

"(a) Governmental police power.

.   .   .

"(c) Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part.

"(d) The effect of any violation of the matters excluded under (a), (b) or (c) above, unless notice of a

defect, lien or encumbrance resulting from a violation has been recorded at Date of Policy in those records in which under state statutes deeds, mortgages, lis pendens, liens or other title encumbrances must be recorded in order to impart constructive notice to purchasers of the land for value and without knowledge; provided, however, that without limitation, such records shall not be construed to include records in any of the offices of federal, state or local environmental protection, zoning, building, health or public safety authorities."

One can speak of § 54A as in some sense an exercise of the police power, but the judge apparently sees as more cogent, and correctly so, the reference in (c) to a "law . . . restricting . . . or prohibiting the . . . use . . . of the land . . . ." Taken of itself, this language would exclude coverage for the damage to the security of the Bank's mortgage caused in the circumstances by § 54A. But (c) must be read in relation to (d). The judge says, necessarily referring to (d), that it "excludes from coverage the effect of any violation of any such law, ordinance or regulation." This statement takes in (d) only through the opening words — "The effect of any violation of the matters excluded under (a), (b) or (c) above." But the rest of (d) provides in effect that the exclusion is withdrawn and coverage subsists when the violation is of record in the ordinary land registry, so that knowledge of it is readily available.

In explanation of the origin of (d), the Bank refers us to a 1985 publication of the Section of Real Property, Probate and Trust Law of the American Bar Association entitled Title Insurance: The Lawyer's Expanding Role. In an article, The Basics of Title Insurance, written by Mr. Raymond J. Werner, vice-president and associate general counsel of Chicago Title, we are told that from 1970 to 1984 an exclusion from coverage appearing in the standard American Land Title Association policy, corresponding to the present clause

(c), ran thus:

> "Any law, ordinance or governmental regulation (in-
> cluding but not limited to building and zoning ordi-
> nances) restricting or regulating or prohibiting the oc-
> cupancy, use or enjoyment of the land, or regulating the
> character, dimensions or location of any improvement
> now or hereafter erected on the land, or prohibiting a
> separation in ownership or a reduction in the dimen-
> sions or area of the land, or the effect of any violation of
> any such law, ordinance or governmental regulation."

"This Exclusion," the author writes, "was subjected to criti-
cism because it flatly excluded coverage over the effect of a
violation of one of the excluded categories of laws, ordi-
nances or governmental regulations, arguably even if notice
of that violation appeared in the public record. While the ti-
tle industry was sympathetic to the argument that coverage
should be afforded against such notice of violation if they ap-
peared 'of record,' there was an ongoing debate over just
which records were to be included in the ambit of the title
insurer's responsibility. Title insurers were willing to search
and insure through an examination of the land records gener-
ally found in the recorder's office, but they were afraid of
being liable for what may be found in the records of public
bodies such as the building department, zoning board or
county planning district."

In the 1984 revision of the policy form, the text of (c) is in
substance little changed from the predecessor clause except
for the deletion of the last words, "or the effect of any viola-
tion of any such law, ordinance or governmental regulation."
Clause (d) is added to accomplish the purpose mentioned by
the author.

There is a question whether the fact of railroad ownership,
obvious on the record, taken together with the conveyancer's
familiarity with § 54A, should be treated as the functional
equivalent of a notice of violation under (d). Arguably an
affirmative answer is so clear that the (c) exclusion should be
held withdrawn as a matter of law. At the least there is an

ambiguity, and, as the judge indicated elsewhere in her memorandum, in case of ambiguity not only is evidence about the proper meaning or intended meaning to be admitted, see *Trafton* v. *Custeau*, 338 Mass. 305, 307-308 (1959); *Commercial Union Ins. Co.* v. *Boston Edison Co.*, 412 Mass. 545, 557 (1992), but the rule contra proferentem — that intendments will be made against the creator of the writing — becomes applicable.

2. The judge recognized that an insurer might voluntarily assume an obligation not cast on it by the terms of the title policy. The Bank offered proof of a practice of insurers, including Chicago Title, known to local conveyancers, that would provide support for a finding of an obligation so assumed.

Mr. Bernard L. Greenhood, a veteran Massachusetts lawyer with large experience as a conveyancer, who was an approved agent of Chicago Title (and of other title insurers), swore an affidavit herein. He said: "As an experienced real estate practitioner, I have observed that it is the custom and usage that title insurance companies, or their agents, disclose to potential insureds, or their attorneys, all relevant matters affecting the property which an examination of the pertinent records at the appropriate registry of deeds reveals without regard to any particular exceptions or exclusions under the title insurance policy just as attorneys would report such matters to their clients." The affiant, indeed, summed up the purpose of title insurance as "two-fold: . . . to disclose to the insured the results of the examination of the relevant records at the registry of deeds and other pertinent records and . . . to insure certain risks with respect to title matters."

Mr. Greenhood indicated that the record at the land registry would have revealed the § 54A problem to any practical conveyancer. Even if Chicago Title regarded the defect as not a covered risk, its practice, like that of other title insurers, was to give notice of it. The notice might well take the form of a notation on Schedule B.[4]

---

[4]The Bank introduced two policies, Nos. 22 0034 02 001254 and 22 0034 04 001221, issued by Chicago Title (antedating the 1984 revision of

We gather that Chicago Title would deny the claim that there was an understood practice as described. To generalize the company's probable position in this litigation from the testimony of Kathleen Mitchell, an employee of the company engaged in preparing policies for issuance: when confronted with a matter appearing in the land record that the insured would be concerned about, but which was not a covered risk, the company would think it appropriate to make a note of it on the policy but would not feel any duty, or recognize any practice, to do so.

If the practice has been as the Bank contends, and has entered into the common understanding of local conveyancers, then there would be ground for holding the company to it as an obligation (until effectively renounced). Even so, there is a question, unexamined on this appeal record, whether the claimed practice is to note only points of concern to the insured that in fact come to the attention of the company (agent), or also the points that would be observed in an ordinary, competent search. Also unexamined is the measure of damages, if any, resulting from a breach of the obligation assumed.

The existence of the practice, its nature and consequence, are matters for further development.[5]

---

the form), in which references to § 54A were written on Schedule B. (A third policy, issued by Ticor Title Insurance Company, No. 09 30465, also mentioned § 54A, but the reference is not clear, as the policy is not reproduced in full text.) One cannot tell from the notation on Schedule B whether the writer regarded the § 54A flaw as an otherwise covered risk, which the writer wanted specially to except from coverage, or took the § 54A flaw as a risk not covered but one that should be notified to the insured. We suppose, however, that the fact a reference to § 54A appeared in Schedule B would not necessarily embarrass a later claim that the § 54A flaw was not a covered risk to begin with.

[5]Among the miscellaneous "conditions and stipulations" of the policy there was a provision: "Liability limited to this Policy. This instrument together with all endorsements and other instruments, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company." (A succeeding paragraph repeats the thought in some detail.) The provision loses effectiveness as an integration clause because it is boilerplate and not the result of negotiation between the parties. See *Greenery Rehabilitation Group, Inc.* v. *Antaramian,* 36 Mass. App. Ct. 73, 75-76 (1994), and cases cited at 76. Were the provision fully effec-

As there are remaining unresolved issues (1) whether there is coverage under the terms of the policy and (2) whether the defendant is obligated, and to what extent, pursuant to a claimed practice, the summary judgment is vacated, and the action is remanded for further proceedings.

*So ordered.*

tive as an integration, it would still not exclude evidence and evaluation of a practice that was part of the basic transaction. See 2 Farnsworth, Contracts § 7.13 (1990).