NATIONAL CREDIT UNION ADMINISTRATION, In Its Capacity As Liquidating Agent of Barnstable Community Federal Credit Union, A Federally Insured Credit Union, Plaintiff,

v.

TICOR TITLE INSURANCE COMPANY, Defendant.

Civ. A. No. 92–10753–PBS.

United States District Court, D. Massachusetts.

Jan. 10, 1995.

Douglass A. Hale, Wynn & Wynn, Raynham, MA, for plaintiff.

Raymond J. Brassard, Rackemann, Sawyer & Brewster, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Plaintiff National Credit Union Administration ("NCUA"), in its capacity as liquidating agent of Barnstable Community Federal Credit Union ("BCFCU"), seeks a declaratory judgment that the title insurance policy issued by defendant, Ticor Title Insurance Company ("Ticor") to BCFCU on a Cape Code motel is in full force and effect. It has also asserted a breach of contract claim. Ticor asserts that there is no coverage under the policy because BCFCU suffered and agreed to the mortgage which was senior to its own mortgage on the subject property. Both sides have moved for summary judgment. For the reasons stated below, the Court **DENIES** the plaintiff's motion for summary judgment and **ALLOWS** the defendant's motion for summary judgment.

## BACKGROUND

### 1. *The Purchase of the Earl of Sandwich Motor Lodge*

The record discloses the following undisputed facts. In July, 1986, James K. Smith ("Smith"), then Vice President of BCFCU and a member of its board of directors, executed an offer to purchase the Earl of Sandwich Motor Lodge (the "Property") in Sandwich, Massachusetts from Edward and Natalie Ostrom (together, the "Ostroms") for a price of $1,275,000. It was executed by Smith "for Duke Realty Trust". Attached to that offer was a document, also executed by Smith, providing that the buyer would grant the sellers a first mortgage on the Property in the amount of $800,000. No copies of the offer and appended document were in BCFCU's files when the NCUA examiners reviewed those files.

Two Purchase and Sale Agreements were then executed. The first, dated August 3, 1986, listed Duke Realty Trust (the "Trust"), Ambrose Devaney ("Devaney"), Trustee, as the buyer, and listed the purchase price as $1,450,000. The second, dated August 18, 1986, listed John L. Schulenburg ("Schulenburg") or nominee, as the buyer, and listed the purchase price as $1,275,000. When the NCUA examiners reviewed BCFCU's files, the files contained a copy of the August 3, 1986 agreement, but did not contain a copy of the August 18, 1986 agreement.

The October 2, 1986, minutes of the BCFCU Board of Directors Meeting, at which Smith was present, reveal that a loan to the Duke of Earl Realty Trust in the amount of $625,000 was approved by the Board. The loan was to be secured by a first mortgage.

On October 30, 1986, Ambrose L. Devaney, Trustee of the Duke of Earl Trust, purchased the Property from the Ostroms. The following instruments, each dated October 30, 1986, were duly executed and recorded in the Barnstable County Registry of Deeds in connection with Devaney's purchase of the Property: (a) The Declaration of Trust of the Duke of Earl Trust was recorded at Book 5376, page 48; (b) The deed, which recited a purchase price of $1,000,000, from the Os-troms to Devaney, as Trustee, was recorded at Book 5376, Page 52; (c) A mortgage to the Ostroms in the face amount of $800,000 was recorded at Book 5376, Page 54; and, (d) A mortgage to BCFCU in the face amount of $625,000, which secured a $625,000 loan by BCFCU to Devaney, as Trustee, was recorded at Book 5398, Page 260. The mortgage to the Ostroms was a first mortgage; the mortgage to BCFCU was a second mortgage.

The closing of the October 30, 1986, loan to Devaney and the related mortgage was attended by at least the following individuals: Robert Cohen, counsel for BCFCU in the matter and agent for Ticor in issuing all title insurance policies; the Ostroms; and, their counsel, Peter N. Conathan; Devaney; Smith; Richard D. Mangone ("Mangone"), BCFCU's principal financial officer; and Schulenburg. The fact that the Ostroms were to receive a first mortgage was discussed with, or in the presence of, all individuals. There is no evidence as to whether Smith and Mangone were present in their capacity as beneficiaries of the trust, officers of BCFCU, or both.

Devaney, as Trustee, also executed an adjustable rate note, dated October 30, 1986 in the face amount of $800,000, payable to the order of the Ostroms. The note was guaranteed by both Devaney in his individual capacity, and Smith. The Trust's Certificate of Beneficial Interests, dated October 30, 1986, shows Smith, Mangone, Devaney, and Schulenburg as the beneficiaries of the Trust. Devaney was indemnified against any loss suffered on account of the note payable to BCFCU by the Trust's other beneficiaries, other than his proportionate share.

At all relevant times, Cohen in addition to his role as counsel for BCFCU at the closing, was a policy issuing attorney for Ticor. In connection with the closing, Cohen issued a title insurance policy to BCFCU. The policy insured BCFCU's interest as a *first* mortgagee in the Property. The policy did not refer to the mortgage held by the Ostroms.

### 2. *The Refinancing*

In June, 1987, Devaney and BCFCU refinanced the October 30, 1986 loan. The rec-

ords of BCFCU show that the Executive Committee approved a loan to the Duke of Earl Realty Trust in the amount of $617,994, to be secured by a first mortgage. On June 15, 1987, Devaney, as Trustee, executed an adjustable rate mortgage note in the principal amount of $617,994.20 and a mortgage to BCFCU securing payment of the note. There was nothing in the mortgage to indicate that it was subordinate to any other mortgage.

Cohen, who was BCFCU's counsel in connection with the closing of the June 15, 1987, loan and related mortgage, issued a Ticor title policy dated June 15, 1987, insuring BCFCU's interest in the Property as a *first* mortgage in the amount of $617,994.20. The policy did not refer to the first mortgage held by the Ostroms. At the time it was executed, Smith, Lynn Vasapolle (BCFCU's Treasurer), Cohen and Devaney knew that the June 15, 1987, mortgage was junior to the Ostroms' mortgage. Smith executed the discharge of the credit union's 1986 mortgage in connection with the loan's refinancing. From October 30, 1986 through June 15, 1987, Mangone was chairman of the supervisory committee of the credit union.

### 3. *Discovery of the "Error"*

On March 13, 1991, the NCUA Board issued an order of conservatorship with respect to BCFCU. On April 3, 1991, Cohen telecopied a letter to Dan Buckley of BCFCU, in which he recognized and apologized for the "clerical error" in the Duke of Earl title insurance policy. He states: "Dear Mr. Buckley: A short time ago, before the NCUA take-over, Lynn Vasapolle brought to my attention the fact that she thought there was an error in the Duke of Earl title insurance policy in that the Credit Union's position should be shown as a second mortgage and not as a first mortgage ... In reviewing my file, the status of the Credit Union as a second mortgage is well documented ..." Included in the insurance declaration pages in the files of BCFCU when the NCUA examiners reviewed the files was a business pro property coverage part declarations page showing the mortgage holder name to be BCFCU, as well as a sheet

showing the mortgage holders to be the Ostroms and BCFCU. The names of the Ostroms appeared before that of BCFCU, but there was nothing to indicate that one was a first mortgage and one was a second mortgage.

### 4. *Liquidation*

On June 28, 1991, the NCUA closed BCFCU and appointed itself liquidating agent. On July 9, 1991, the Ostroms conducted a foreclosure sale of the Property. The high bid at that sale was $750,000.00 from the Ostroms. No proceeds from that sale were paid to BCFCU or the NCUA. The NCUA now seeks to collect the full amount of the title insurance policy, $617,994.20. Ticor has refused to pay the claim on the basis that it falls within exclusion 3(a) of the policy.

## DISCUSSION

### A. *The Summary Judgment Standard*

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law.

Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position. If this is accomplished, the burden then shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]. The nonmovant cannot simply rest upon mere allegations. Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue. There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir. 1994) (internal quotes and citations omitted).

When faced with cross-motions for summary judgment, the court is not required to write separately on each motion. *See Bellino v. Schlumberger Technologies, Inc.,* 944 F.2d 26, 33 (1st Cir.1991). It must, however, "evaluat[e] each cross-motion on its own merits[,]" *Id.* (citation omitted), while "view[ing] the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party." *Kelly v. Blue Cross & Blue Shield of R.I.,* 814 F.Supp. 220, 223 (D.R.I.1993).

### B. *Contentions of the Parties*

Ticor contends that exclusion 3(a) of the title insurance policy it issued to BCFCU bars the NCUA's claim for damages. The policy provides in part:

> The following matters are expressly excluded from the coverage of this policy: ... 3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy or acquired the insured mortgage and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy (except to the extent insurance is afforded herein as to any statutory lien for labor or material).

Ticor asserts that under the terms of this exclusion BCFCU, through Smith and Mangone, "suffered and agreed to" an encumbrance on its mortgage in the Ostroms' senior mortgage. Moreover, Ticor contends that because the exclusion is enforceable, its summary judgment motion should be allowed.

The NCUA, on the other hand, contends that it is entitled to summary judgment based on both the *"D'Oench, Duhme* doctrine" and 12 U.S.C. § 1823(e). The statute which applies to the NCUA in particular is 12 U.S.C. § 1787(p)(2). As a threshold matter, the NCUA refers consistently to § 1823(e) throughout its pleadings, and the weight of case law in this area has involved the application of § 1823(e). Another court in this circuit has stated that the case law interpreting § 1823(e) is generally applicable to § 1787(p)(2), because the agencies that regulate financial institutions are in the similar position of safeguarding the interests of depositors. *Savoy v. White* 788 F.Supp. 69, 72 (D.Mass.1992). Furthermore, Congress intended these statutes to have the same relationship to the federal common law *D'Oench* doctrine. *National Credit Union Admin. Bd. v. Regine,* 795 F.Supp. 59, 64 (D.R.I.1992).

### C. *The D'Oench Doctrine*

The *D'Oench* doctrine, which arose out of *D'Oench, Duhme & Co., Inc., v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), holds that private parties may not rely on any "secret agreements" between themselves and a bank in order to defeat claims by the FDIC. As Justice Douglas explained:

> Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners ... The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled.

315 U.S. at 460, 62 S.Ct. at 681.

In order to accurately assess the solvency of the banks that they insured, federal banking authorities must be able to rely on the records of those banks. *In re NBW Commercial Paper Litigation,* 826 F.Supp. 1448, 1455 (D.D.C.1992); *FDIC v. Bay Street Development Corp.,* 32 F.3d 636, 640 (1st Cir. 1994). The rationale behind the *D'Oench* doctrine has been colorfully explained by the Fifth Circuit:

> The doctrine means that the government has no duty to compile oral histories of the

bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities.

*FDIC v. Hamilton*, 939 F.2d 1225, 1230 (5th Cir.1991) (quoting *Bowen v. FDIC*, 915 F.2d 1013, 1016 (5th Cir.1990)).

■ The *D'Oench* doctrine applies to disputes involving the NCUA. *See Savoy v. White*, 788 F.Supp. at 72. Pursuant to 12 U.S.C. § 1787(p)(2), private parties are prohibited from defeating the NCUA's interest by relying on certain agreements.[1] Section 1787(p)(2) provides:

> No agreement which tends to diminish or defeat the right, title, or interest of the Board in any asset acquired by [it] under this subsection, either as security for a loan or by purchase, shall be valid against the Board unless such agreement—
>
> (A) is in writing,
>
> (B) shall have been executed by the credit union and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the credit union,
>
> (C) shall have been approved by the board of directors of the credit union, which approval shall be reflected in the minutes of such board; and
>
> (D) shall have been, continuously, from the time of its execution, an official record of the credit union.

This section requires categorical compliance. *See RTC v. Carr*, 13 F.3d 425, 429 (1st

Cir.1993); *Beighley v. FDIC*, 868 F.2d 776, 738 (5th Cir.1989).

Under both these doctrines, the NCUA asserts that it was entitled to rely on the records of BCFCU, which showed that the mortgage to Devaney was a first mortgage insured by the title policy, and which gave no indication that there were any side agreements or fraud committed which would make the title policy subject to any defenses. Under this theory, the understanding among the parties that BCFCU's mortgage was to be junior to the Ostroms' mortgage was a secret agreement that does not bind the NCUA because it is barred by *D'Oench* and by § 1787(p)(2).

### D. *The Howell Exception*

Ticor argues that the *D'Oench* doctrine and § 1787(p)(2) do not bar its claim against the NCUA because it was not a party to any oral or secret agreement to diminish any asset of the NCUA, and because the policy does not provide insurance under its written terms. Relying on the so-called *Howell* exception to the *D'Oench* doctrine, Ticor contends that exclusion 3(a)'s applicability was obvious from the face of the written insurance policy in BCFCU's files.

■ *D'Oench* is inapplicable where the face of the instrument whose terms Plaintiff seeks to enforce manifests bilateral obligations that form the basis of the opposing party's defense. *Howell v. Continental Credit Corp.*, 655 F.2d 743 (7th Cir.1981). The Court explained:

> When ... the asset upon which the FDIC is attempting to recover is the very same agreement that the makers allege has been breached by the FDIC's [predecessor], § 1823(e) does not apply. None of the

---

1. While § 1823(e) is often referred to as the codification of *D'Oench*, *See, e.g., FDIC v. Wright*, 942 F.2d 1089, 1094 (7th Cir.1991); *RTC v. Feldman*, 3 F.3d 5, 7 (1st Cir.1993), the common law *D'Oench* doctrine and § 1823(e) do not completely overlap. *See Tuxedo Beach Club Corp. v. City Fed. Sav. Bank*, 749 F.Supp. 635, 642 (D.N.J. 1990). Section 1823(e) is "broader [than *D'Oench*]" in that it applies to any agreement, whether or not it was secret and regardless of the maker's participation in a scheme; it is narrower in that it applies only to agreements and not to

other defenses the borrower might raise." *Id.* *See also In re NBW Commercial Paper Litigation*, 826 F.Supp. at 1466 (stating that *"D'Oench* can best be described as a safety net" which "remains to cover situations which fall through the [statutory] cracks."). Because the statute and doctrine have cross-pollinated to the degree that it is difficult to determine where the statute ends and *D'Oench* begins, *Id.* at 1457, the cases discussed often refer to both doctrines interchangeably.

policies that favor the invocation of the statute are present in such cases because the terms of the agreement that tend to diminish the rights of the FDIC appear in writing on the face of the agreement that the FDIC seeks to enforce.

*Id.* at 747 (citing *Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 313 (M.D.Tenn. 1978)).

The fact that a court must go outside the written agreement to test the strength and validity of the defenses is not fatal "where the foundation and basis of that defense is in a document arguably meeting the nonsecrecy requirements of § 1823(e)." *Id. Cf. FDIC v. Bay Street Development Corp.,* 32 F.3d 636, 639 (1st Cir.1994 (*Howell* exception is not applicable where written agreement ambiguous and bank's obligation did not appear explicitly on the face of the document).

■ Exclusion 3(a) appears in writing on the face of the title insurance policy. The FDIC cannot seek to enforce the policy while disclaiming its exceptions. *Cf. FDIC v. Panelfab Puerto Rico Inc.,* 739 F.2d 26, 30 (1st Cir.1984) ("[W]e will not consider the [policy] as a whole to be valid for the purpose of collecting ... only to invalidate under [§ 1787(p)(2) ] a particular option contained in the agreement that, when exercised according to its terms, is a defense to that collection.").

Ticor's defense falls within the exception to *D'Oench* and § 1787(p)(2) for claims that are premised on a breach of an agreement or warranty that is itself contained in the bank's records. The First Circuit has cited with approval the *Howell* exception to the *D'Oench, Duhme* doctrine. *See Vasapolli v. Rostoff,* 39 F.3d 27, 33 (1st Cir.1994). (While it is settled beyond peradventure that both misrepresentation and fraudulent inducement are within D'Oench Duhme's sphere of influence, there is "an exception where plaintiffs identify a violation of a specific contractual provision of assurance contained in the bank records."); *Levy v. FDIC,* 7 F.3d 1054, 1057 (1st Cir.1993) (Howell exception applies where "the claims or defenses which the nongovernmental party seeks to enforce are contained *either* in the very instrument which the government seeks to enforce [citations omitted] *or* they are contained in closely related or "integral loan documents") (emphasis in original).

The cases in which the *Howell* exception has been found applicable have involved documents that facially manifest obligations contained in the documents themselves. *See e.g., FDIC v. Mackie,* 962 F.2d 1144, 1151 (5th Cir.1992) (stating that defenses based on obligations contained in a written loan agreement, i.e. breach of the agreement, may be asserted against the FDIC as long as the plaintiff "does not rely on any unrecorded agreements to support his allegations") (citing *FDIC v. Laguarta,* 939 F.2d 1231, 1239 (5th Cir.1991)); *FDIC v. Aetna Cas. & Sur. Co.,* 947 F.2d 196, 208 (6th Cir.1991) (where insurance bond is a conditional or bilateral contract, the FDIC acquires the bond with knowledge of the recognized defenses available under insurance law); *Baumann v. Savers Federal Sav. & Loan Assoc.,* 934 F.2d 1506, 517 (11th Cir.1991) (stating that evidence focusing on whether the savings and loan association had breached the terms of the written documents was not barred by *D'Oench* ); *Cf. FDIC v. Smith,* 848 F.Supp. 1053, 1057 (D.Mass.1994) (stating that claims based on a breach of the implied covenant of good faith in an agreement were governed by *D'Oench* or § 1823(e)).

■ Put another way, section 1787(p)(2) prohibits claims and defenses to be asserted against the NCUA based on unwritten agreements which would tend to diminish or defeat the right, title or interest of the NCUA in any asset acquired by it. An insurance policy is an asset for purposes of the statute, *FDIC v. Gulf Life,* 737 F.2d 1513, 1515 (11th Cir.1984), and the First Circuit has joined the circuits which hold that non-negotiable instruments fall within the ambit of § 1823(e). *FDIC v. PLM International, Inc.,* 834 F.2d 248, 255 (1st Cir.1987). But where the BCFCU had an unenforceable asset under the terms of the written agreement, the NCUA cannot now seek to enforce the asset without acknowledging the bilateral written obligations in it. The result would be different if Ticor itself were a participant in an oral agreement with the bank to grant

title insurance for a first mortgage with knowledge that the bank only had a second mortgage. The reason why attorney Cohen's knowledge should not be imputed to Ticor will be addressed just below.

### E. *The Ticor Title Insurance Policy*

 Having determined that the *Howell* exception applies, the Court must now examine the title insurance policy itself to determine its enforceability. Ticor has the burden of establishing the applicability of the exclusion. *See Todisco v. National Fire Ins. Co.,* 356 Mass. 736, 736–37, 254 N.E.2d 787, 788 (1970) (burden of proof on insurer for establishing exclusions to coverage).

#### 1. *Knowledge of Agents with Adverse Interest*

Ticor makes the argument that because officers of the credit union *knew* of the error in the title insurance policy they "created, suffered, assumed, or agreed to" the encumbrance, and thus the NCUA is now ineligible to collect on the policy. (It is stipulated that Smith, Vasapolle, Cohen, and Devaney knew that the June 15, 1987, mortgage was junior to the Ostroms'). The NCUA, on the other hand, contends that the officers' knowledge does not bind BCFCU because the officers were acting adversely to the interests of the credit union. Both sides minimize Cohen's dual role as issuing agent for Ticor and attorney for BCFCU in the Earl of Sandwich Motor Lodge matter.

 State law governs the question of whether knowledge of fraud of corporate officers of failed savings and loans can be imputed to the savings and loan, and hence to the FDIC as receiver. *O'Melveny & Myers v. FDIC,* —— U.S. ——, ——, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994). The general rule under Massachusetts law is that the knowledge of directors, officers and agents acquired in the course of official duties is imputed to the corporation. *Sperry Rand Corp. v. Hill,* 356 F.2d 181, 186 (1st Cir. 1966). "A principal is liable for the fraud committed by his agent or servant acting within the scope of his employment." *McCarthy v. Brockton Nat'l Bank,* 314 Mass. 318, 325, 50 N.E.2d 196, 201 (1943); *Cf.*

*Lawyers Title Insurance Corp. v. U.S. Savings Bank of America,* 1990 WL 29214 at *5 (D.Mass. Mar. 7, 1990) (where one of several innocent persons must suffer by the acts of another, he who has enabled such third person to occasion the loss must sustain it). Where an agent has knowledge of a fraud but is acting for his principal, his knowledge *is* imputed to the principal. *See Tremont Trust v. Noyes,* 246 Mass. 197, 207, 141 N.E. 93, 98 (1923). But where an agent is engaged in an independent fraudulent act, his knowledge is not imputable. *Id.* However, the principal cannot claim the advantages of the bad acts of its officers without assuming the imputation of their knowledge. *Id.* ("where the assets of the principal are by the hand of the treacherous agent in execution of the fraud exchanged for the new security . . . or other things of value, then the knowledge of the agent is imputed to the principal").

 Generally, an agent's knowledge of his own unauthorized acts is not imputed to the principal when the agent has acted fraudulently toward his principal. *Sperry Rand Corp.,* 356 F.2d at 187. Where a "principal is attempting to avoid liability to an innocent party, a greater adverse interest on the agent's part might well be required before insulating the principal from his agent's knowledge." *Id.*

Restatement (Second) of Agency § 282 provides useful guidelines for dealing with the imputation of knowledge to a principal where the agent is acting adversely to the principal:

(1) A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes, except as stated in subsection (2).

(2) The principal is affected by the knowledge of an agent who acts adversely to the principal:

(a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;

(b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or

(c) if, before he has changed his position, the principal knowingly retains a benefit through the act of the agent which he would not have received.

In his treatise on agency law, Professor Seavey also provides useful guidance:

A principal is liable for many frauds by the agent, although committed for the agent's own purposes. In fact, most unauthorized frauds by agents are committed because of the strong conflicting interests of the agent. In such cases, the innocent principal is liable because the agent has knowledge which makes his representations deceitful. The fact that the agent has every reason to conceal the facts from the principal is immaterial....

*Seavey, Agency* § 102 (1964).

 Here, two BCFCU officers had interests adverse to the BCFCU when Smith, the vice president, and Mangone, the chief financial officer, participated in obtaining a loan from the bank which was based on a first mortgage position when they themselves were the beneficiaries of the trust which received the loan and when they well knew that the sellers of the property had the first position. There is no evidence that the officers disclosed their adverse interests to the BCFCU, or disclosed the misrepresentations made to the title insurance company concerning the second mortgage position of the BCFCU. However, under Restatement (Second) of Agency, § 282(2)(a), despite their adverse interest, the knowledge of the officers should be imputed to BCFCU. Any other legal conclusion would be inequitable because it would allow the BCFCU to insulate itself from its agents' knowledge and acquire an asset from Ticor, an innocent party. Indeed, it is worth highlighting that during the refinancing, Vasapolle, BCFCU's treasurer, was aware of the second mortgage position of the BCFCU, and there is no record evidence she had any conflict at all. Therefore, her knowledge must be imputed

to the BCFCU at the time it got the second title policy.

Plaintiff argues that the knowledge of attorney Cohen about the Ostrom's first mortgage should be imputed to his principal Ticor, thereby depriving it of innocent party status. In *Somerset Savings Bank v. Chicago Title Ins. Co.*, 37 Mass.App.Ct. 82, 85, 636 N.E.2d 1358, 1359 (1994), *review granted*, 418 Mass. 1108, 641 N.E.2d 1351 (1994), the Massachusetts Appeals Court discussed the problematic role of the lawyers who serve in the dual capacity of attorney for the bank and the title insurance company: in wearing their hat as counsel to the Bank, the lawyers "naturally warranted the title and possibly other things; yet, wearing their other hat as agents of [the title insurance company], they do not bind the company to any like warranties"). By serving in this dual capacity, Justice Kaplan points out that the lawyer places himself in a "conflicted situation." *Id.*

 "A transaction conducted by a common agent without the knowledge of either principal that he is acting for the other is voidable by either." Seavey, *Agency* at § 119. A principal who knows of such double employment and that the other is ignorant of it, is guilty of a tort. *Id.* Here the BCFCU records reflect that Cohen was the issuing agent of Ticor, although there is nothing in the record to indicate that Ticor was aware of the employment of Cohen as counsel to the BCFCU. Even assuming both parties were unaware of the double employment, at best that makes the contract voidable by either party.

 Further, even assuming both parties were aware of the double employment in light of the general practice described in *Somerset*, there is no evidence Cohen disclosed to either principal the second mortgage position of the BCFCU. Because Cohen acted adversely to *both* his principals, his knowledge cannot be imputed to either party. See Restatement (Second) of Agency § 279 (1958) ("[t]he principal is not affected by the knowledge of an agent as to matters involved in a transaction in which the agent deals with the principal ... as, or on account of, an adverse party.") *Cf.* Seavey, *Agency* at § 103, p. 186 ("a person who, with the partic-

ipation by the agent, answers inaccurately questions as to his health cannot expect that an insurer of his life or health will be liable on the policy").

Plaintiff argues that there is a disputed issue of fact concerning the applicability of exclusion 3(a). Generally, whether the clause applies is a question of fact, not law. *See Resolution Trust Corp. v. Ford Mall Assoc.,* 819 F.Supp. 826, 840 (D.Minn.1991) (denying summary judgment where evidence was disputed as to whether insured intentionally created liens which were superior to its own). However, plaintiff presents no admissible evidence to refute the undisputed facts that three senior BCFCU agents intentionally created and agreed to the second mortgage position. The question of whether their knowledge should be imputed to BCFCU is a question of law, not fact. *Falmouth National Bank v. Ticor Title Insurance Co.,* 920 F.2d 1058, 1061 (1st Cir.1990) ("[a]pplication of the terms of an insurance policy to established facts is a question of law.") (citations omitted).

### 2. *Exclusion 3(a); Intentional Conduct*

[18] The language of exclusion 3(a) is standard in title insurance policies.

> The term "created" has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence or negligence. Similarly, the term "suffered" has been interpreted to mean consent with the intent that "what is done is to be done," and has been deemed synonymous with "permit," which implies the power to prohibit or prevent the claim from arising ... "Assume," under this definition requires knowledge of the specific title defect assumed. And "agreed to" carries connotations of "contracted" ... As with the other terms, this exception implies some degree of intent.

*American Savings and Loan Assn. v. Lawyers Title Insurance Corp.,* 793 F.2d 780, 784 (6th Cir.1986) (citations omitted). The insurer will generally only escape liability under this exclusion if the encumbrance resulted from intentional misconduct, or the insured either expressly or impliedly assumed or

agreed to the encumbrance. *Brown v. St. Paul Insurance Corp.,* 634 F.2d 1103, 1108 n. 8 (8th Cir.1980). Courts are more apt to find that an insured created, suffered, assumed, or agreed to an encumbrance where holding otherwise would give the insured an unwarranted windfall. *Id.* at 1110; *American Savings and Loan v. Lawyers Title Insurance Corp.,* 793 F.2d at 784. *See also, First National Bank of Minneapolis v. Fidelity National Title Insurance Co.,* 572 F.2d 155, 162–63 (8th Cir.1978) (the insurer must show by a preponderance of the evidence that the bank agreed that its mortgage would occupy a second position).

■ Ticor repeatedly asserts that Smith, Mangone, and Cohen all had knowledge that the mortgage from BCFCU was subordinate to the Ostroms. Smith executed the offer to purchase the Property from the Ostroms, and executed a document providing that the buyer would grant the Ostroms a first mortgage. The minutes of BCFCU reveal that the Board, consisting in part of Smith and Mangone, granted the Trust, whose beneficiaries were, among others, Smith and Mangone, a loan in exchange for a *first* mortgage. Smith also guaranteed the payment of the promissory note that was secured by the Ostroms' mortgage. During the refinancing, the Treasurer agreed to the second mortgage position of BCFCU. Given the extensive involvement of the officers in arranging for the two mortgages, the undisputed evidence supports Ticor's position that BCFCU's officers intentionally "suffered, assumed, or agreed to" the first mortgage. Any other result would be inequitable here, because it would give BCFCU a windfall as a result of the fraudulent conduct of its agents, albeit unknown to it, at the expense here of an innocent insuring party.

### 3. *Exclusion 3(b): Disjunctive or Conjunctive*

The NCUA next asserts that even if the officers "suffered, assumed, or agreed to" the encumbrance on their title, subparagraph 3(b) precludes Ticor's reliance on subparagraph 3(a). Subparagraph 3(b) excludes coverage for defects, liens, and encumbrances "not known to the company and not shown

by public records but known to the insured claimant ..." Thus, the NCUA urges that the four clauses of the exclusion section by read conjunctively. That is, the NCUA asserts that Ticor cannot enforce exclusion 3(a) because exclusion 3(b) also applies, and under exclusion 3(b) Attorney Cohen's knowledge of the Ostrom's first mortgage would be imputed to Ticor, so that under the terms of exclusion 3(b) the Company *knew* of the encumbrances on BCFCU's mortgage.

 This argument fails for a number of reasons. First, Ticor correctly asserts that the four clauses of exclusion 3 cannot be read conjunctively without some nonsensical results. For example, Ticor notes that subsections (b) and (d) could not simultaneously be satisfied. An encumbrance "known to the insured claimant at Date of Policy or at date such claimant acquired an estate or interest insured by this policy" in the former instance could not be an encumbrance "attaching or created subsequent to Date of Policy." The NCUA contends that the policy is ambiguous, and thus seeks to invoke the well-settled rule that ambiguous policy language is construed in favor of the insured. *See Falmouth National Bank v. Ticor Title Ins. Co.,* 920 F.2d 1058, 1061 (1st Cir.1990) (and cases cited therein). However, the Court will interpret the terms of a policy using the plain language of the policy, and will not find ambiguity merely because a policy is complex, or because the parties disagree as to the meaning of its terms. *See Continental Casualty v. Canadian Universal Ins. Co.,* 924 F.2d 370, 374 (1st Cir.1991) (stating that an "ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other's") (citing *Jefferson Ins. Co. v. Holyoke,* 23 Mass.App.Ct. 472, 503 N.E.2d 474, 476 (1987)); *FDIC v. Singh,* 977 F.2d 18, 22 (1st Cir.1992) (stating that "a contract is not ambiguous simply because litigants disagree about its proper interpretation") (citations omitted).

 Second, an examination of the case law reveals that courts interpreting the standard policy language of exclusion 3 have interpreted the subsections as disjunctive. *See e.g., Lawyers Title Insurance Corp. v.* *U.S. Savings Bank of America,* 1990 WL 29214, at *5.; *RTC v. Ford Mall Associates Ltd.,* 819 F.Supp. 826, 840 (D.Minn.1991); *American Sav. and Loan v. Lawyers Title Ins. Corp.,* 793 F.2d at 780.; *Lawyers Title Ins. Corp. v. JDC (America) Corp.,* 818 F.Supp. 1543, 1546 (D.S.D.Fla.1993) (in a case which lists the entire exclusionary section, it contains identical language, but also contains a subsection (e) which is preceded by the word "or.") *Cf. Jesko v. American–First Title and Trust Co.,* 603 F.2d 815, 816 (10th Cir.1979).

The implausible results obtained by a conjunctive reading of the policy, as well as the disjunctive reading exhibited in the case law, persuade the Court that section 3 is to be read disjunctively.

### ORDER

For the foregoing reasons, summary judgment for the plaintiff is **DENIED,** and summary judgment for the defendant is **ALLOWED.** The Court orders that the complaint be dismissed.